Honorable David COHEN, Petitioner,

v.

The CITY OF PHILADELPHIA and Honorable John F. Street and Commonwealth of Pennsylvania, Mike Fisher, Attorney General and Honorable Tom Ridge and Philadelphia Authority for Industrial Development (PAID) and The Philadelphia Eagles, Limited Partnership and The Phillies, Inc., Respondents.

Commonwealth Court of Pennsylvania.

Argued Nov. 7, 2001.

Decided Aug. 19, 2002.

As Amended Aug. 22, 2002.

---

Robert M. Jaffe, Philadelphia, for petitioner.

Matthew J. Siembiedg, Philadelphia, for respondent, The Phila. Eagles, Limited Partnership.

Alan J. Davis, Philadelphia, for respondent, The Phillies, Inc.

David Smith, Philadelphia, for respondent, Phila. Auth. For Industrial Development (PAID).

BEFORE: DOYLE, Senior Judge,[1] COLINS, President Judge, SMITH-RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, KELLEY, Senior Judge, and LEADBETTER, Judge.

OPINION BY Senior Judge DOYLE.

Before this Court in our original jurisdiction are the preliminary objections filed by the City of Philadelphia (City) and the Honorable John F. Street, Mayor, the Commonwealth of Pennsylvania (Commonwealth), the Honorable Mike Fisher, the Attorney General of Pennsylvania, the Honorable Tom Ridge, Governor of Pennsylvania,[2] the Philadelphia Authority for Industrial Development (PAID), The Philadelphia Eagles, a Limited Partnership (Eagles), and "The Phillies, Inc." (Phillies) (collectively, Respondents) in response to a petition for review in the nature of a complaint for declaratory judgment and permanent injunction filed by the Honorable David Cohen (Cohen or Petitioner), a taxpayer, a registered voter, and a Councilman–at–Large for the City of Philadelphia.

The petition for review challenges a series of ordinances that Philadelphia's City Council enacted on December 20, 2000, and that were signed into law by Mayor Street on December 28, 2000. These ordinances, particularly Ordinances 721–A and 722–A, set the structure for the development, finance, construction and operation of a new baseball ballpark and football stadium in South Philadelphia at a cost of a little over $1 billion. The City will provide $394 million towards the project; the Teams and the Commonwealth will provide the bulk of the remaining funds, although there is a $53–million shortfall in funding and no record of a source to provide for the difference. By ordinance, however, the source of the $53 million must be other than the City.

City Council authorized the ordinances and the leases that they approved by a vote of fifteen to two pursuant to the Philadelphia Home Rule Charter (Home Rule Charter or Charter),[3] the Economic Development Financing Law,[4] the Capital Facilities Debt Enabling Act (Debt Enabling Act)[5] and the Eminent Domain Code.[6] City Council's vote of fifteen to two was the result of over two years of negotiations between all of the interested parties and seven days of public hearings during which many different individuals testified for and against almost every aspect of the proposal, including the project's financial risks and the structure established to handle the risks.

Ordinances 721–A and 722–A establish a four-lease structure for acquiring, financ-

---

1. This case was assigned prior to the date when President Judge Doyle and Judge Kelley assumed the status of senior judge on January 1, 2002.

2. We recognize that, on October 5, 2001, Governor Ridge resigned his position as Governor and Lt. Governor Mark Schweiker is now the Governor of Pennsylvania. We note that there has been no motion filed to substitute Governor Schweiker as a party in this case and that, in any event, substitution is automatic under Pa.R.A.P. 502(c).

3. Sections 1–100 to 12–503 of the Pennsylvania Code, 351 Pa.Code §§ 1.1–100–12.12–503.

4. Act of August 23, 1967, P.L. 251, *as amended*, 73 P.S. §§ 371–386, retitled the Economic Development Financing Law by Section 1 of the Act of December 17, 1993, P.L. 490.

5. Act of February 9, 1999, P.L. 1, 72 P.S. §§ 3919.101–3919.5102.

6. Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. §§ 1–101–1–903.

ing, constructing and operating each stadium. The City will provide most of its share of stadium funds through this complex lease arrangement. The four types of leases involved are the **Ground Lease** Agreements between the City and PAID (providing for the City's lease to PAID of certain lots of land owned by or to be acquired by the City), the **Prime Lease** Agreements (agreements between PAID and the City that provide for the sublease by PAID back to the City of all or a part of such land and certain improvements to be built on the land, including the Eagles' stadium and the Phillies' ballpark), the **Lease-back Lease** Agreements (agreements between PAID and the City that provide for the sub-sublease of the improved land back from the City to PAID, which in turn allow PAID as landlord to enter into the Team Subleases with the Eagles and the Phillies). The **Team Subleases** outline project development, financial terms, and nonfinancial terms. With respect to the nonfinancial terms, the sublease lease terms and conditions provide that the term of the leases is a "30 year base term, with ten consecutive five year renewal options exercisable by the Team[s]." (Eagles' Lease and Development Terms and Conditions (Sublease Lease Terms) at 7); (Phillies' Lease and Development Terms and Conditions (Sublease Lease Terms) at 7). For purposes of Cohen's arguments, the terms of each of the four Eagles' leases are largely the same as the terms of the Phillies' leases. The parties to the leases are the City, PAID, the Eagles and the Phillies.

In his petition for review, Cohen avers, *inter alia,* that the City "is a municipal corporation organized under the Constitution and laws of the Commonwealth, and the Philadelphia Home Rule Charter" (pet.

for rev., para. 2); that PAID "is the corporate entity charged under various lease documents described herein with various duties in connection with the erection of two new sports stadiums in Philadelphia. The board of directors of PAID is entirely appointed by the Mayor, serves at his pleasure, and functions fully subject to his direction and control" (pet. for rev., para. 6); that the Eagles "is a limited partnership organized and existing under the laws of the State of Delaware, and the owner of the Philadelphia Eagles National Football League [NFL] franchise" (pet. for rev., para. 7); and that the Phillies "is a limited partnership organized and existing under the laws of the Commonwealth of Pennsylvania and is the owner of the Philadelphia Phillies Major League Baseball franchise" (pet. for rev., para. 8).[7]

In **count one** of the six-count petition, Cohen asserts that the City's legislative power is to be exercised only by City Council (pet. for rev., para. 10) and that, *inter alia,*

> [t]he process for appropriating funds is spelled out with great specificity and particularity under the Charter, requiring specific lump sum amounts to be appropriated to particular Departments, within specified classes of expenditure. *Philadelphia Home Rule Charter,* Section 2–300. The sums appropriated each year must match expected revenues exactly so as to assure enactment of balanced budgets, and to forestall the possibility of budget deficits. *Philadelphia Home Rule Charter,* Section, 2–302.

(Pet. for rev., para. 14). Cohen further asserts that Ordinances 721–A and 722–A, which were part of a "package of ordinances to finance the development of two new stadiums in Philadelphia" (pet. for

---

7. Although designated as a corporation in the caption of the case, Cohen describes the Phillies as a limited partnership in the body of the petition.

rev., para. 15), and a variety of lease agreements which were approved pursuant to the ordinances, illegally require unspecified appropriations to be made by the present and future City Councils in contravention of the provisions of the Philadelphia Home Rule Charter. Ordinance 721–A relates to the Eagles' new stadium and Ordinance 722–A relates to the Phillies' new stadium, and these ordinances authorize, *inter alia,* the leases between the City and PAID and authorize PAID to issue $304 million of bond financing for land acquisition, construction, and maintenance. (Pet. for rev., paras. 16, 16a-b).[8]

Cohen avers that, while "the City's contribution is purported to amount to 394 million dollars payable for land acquisition, partial construction of the Phillies park, and partial operation and maintenance of the Eagles stadiums[,]" (pet. for rev., para. 18), he further asserts that number is inaccurate because, "the true cost to the City of the purported 394 million dollars of assistance is 1.3 billion dollars, since the vast bulk of the assistance will be borrowed and will have to be paid back with interest over 30 years." (Pet. for rev., para. 19). Cohen further alleges that even the $1.3–billion estimate is just that—"a mere estimate"—because "the legislative package explicitly allows for unspecified additional borrowings for land acquisition, and contains no limit on the amount of interest, principal and other costs associated with repayment of the bonded indebtedness that the City will be required to pay." (Pet. for rev., para. 20.)

Moreover, according to Cohen, a clause, *viz.,* Section 19.15, contained in each of the Prime Leases between PAID and the City, permits the City, without City Council's approval, to acquire additional obligations at the whim of whomever is Mayor during the course of the thirty to eighty-year lease terms. (Pet. for rev., para. 21). Cohen alleges, *e.g.,* that, even though the teams are "required to pay a minimum of $500,000 in annual rent to PAID for each renewal term of their stadium leases[,]" (pet. for rev., para. 24), the City, without Council's knowledge, redirected those rental monies to the Delaware River Port Authority (DRPA) in order to repay a loan the DRPA made with respect to the stadium, which repayment will result in the loss of millions of dollars in future City revenues. *Id.* Cohen further avers that, although Section 17.2 of the Lease-back Lease Agreements for both stadium projects provides that PAID cannot change the leases with the Phillies and the Eagles " 'in any way which would materially adversely affect the obligations of the **Authority** ... without the consent of Council,' " (pet. for rev., para. 25), Section 17.2 only gives Council the right to protect the assets and rights of PAID rather than those of the City. (Pet. for rev., para. 27).

According to Cohen, the City Solicitor has the "sole discretion to impose unlimited new obligations upon the City" as dictated by Section 6 of both Ordinance 721–A and Ordinance 722–A, and, therefore, the "caps" contained in the ordinances are "particularly meaningless." (Pet. for rev., para. 28). As well, Cohen alleges that Section 5 of the ordinances also clarifies that any obligations the City or PAID incurs in the future will be binding on the City, and Council approval thereof will not be required. (Pet. for rev., para. 30). Cohen therefore alleges that "Ordinances 721–A and 722–A profoundly and unlawfully undermine and annul City Council's powers under the Home Rule Charter, and constitute an unlawful delegation of those

8. The City will pay $90 million for a combined contribution of $394 million. (Notes of

Testimony, Hearing of February 16, 2001, at 28–29).

powers and duties to the Executive Branch of the City." (Pet. for rev., para. 31).

In **count two** of the petition, Cohen avers that Ordinances 721–A and 722–A are violative of the Home Rule Charter since they do not permit the City to "opt out" of a financial commitment to the Eagles and the Phillies after four years, as required by the Home Rule Charter. Cohen also alleges that PAID is "no more than a straw party to these contracts, whose real obligor is the City." (Pet. for rev., para. 35). Cohen further alleges that, since City Council lately enacted Ordinance 010333, which authorizes the City to enter into "non-disturbance agreements" with the Teams (pet. for rev., paras. 37 and 38), and each of these agreements has a section expressly providing that, if the City terminates the contracts with PAID, the City, rather than PAID, will then become the teams' landlord, in direct privity with them (pet. for rev., para. 39), regardless of whether PAID remains as a party, the City is bound by these contracts for thirty to eighty years, despite the fact that the Home Rule Charter has "opt out" requirements. Cohen asserts that these types of "long-term commitments" are illegal and violate the Home Rule Charter. (Pet. for rev., para. 40).

In **count three** of the petition, Cohen avers that Ordinances 729, 730 and 731 attempt to evade the requisite provision of the Home Rule Charter that requires City Council to approve the purchase of real estate. Specifically, Cohen alleges that, "[p]ursuant to Section 5–900(a)(4) of the City Charter, no real estate may be purchased by the Department of Public Property without authorization by ordinance" (pet. for rev., para. 42); that "ordinances approving [purchases] must, and always do, limit the price that may be paid for the land to be acquired" (pet. for rev., para. 43); that ordinances that approve condemnation as a means to acquire property exclude the price, since it cannot be determined at the time of condemnation (pet. for rev., para. 44); that "Ordinances [729, 730 and 731] authorized the acquisition of properties for the stadium project by either purchase or condemnation with no price limitation" (pet. for rev., para. 45); and that "[a]cquisition of any properties for stadium purposes through negotiated purchase(s) under the purported authority of ordinances [729, 730 and 731] is illegal and void unless and until Council approves the purchase price(s) thereof." (Pet. for rev., para. 47).

In **count four** of the petition, Cohen alleges that the City and its citizenry have many challenges to face in the future, including "the failing and underfunded schools, a growing population of impoverished citizens facing a cutoff of all governmental assistance, the continued growth of the AIDS epidemic, growing physical blight in large sections of the City, a financially imperiled municipal gas works, along with a declining tax base to pay for the amelioration of all of these problems." (Pet. for rev., paras. 49 and 50). Cohen avers that the Council violated its fiduciary duty by "committing approximately $1.3 billion in expenditures for new sports stadiums over 30 or more years to two private corporations, plus the unlimited increases in such expenditures that are authorized under various lease agreements and ordinances" (pet. for rev., para. 53) and that these contracts and leases illegally impair Cohen's and City Council's "ability to act in accord with [their] fiduciary duty." (Pet. for rev., paras. 54 and 55).

In **count five** of the petition, Cohen alleges that using the Debt Enabling Act to provide Commonwealth funds for the stadium projects constitutes a denial of his and City Council's basic rights to legislate and appropriate under the Home Rule

Charter. Specifically, Cohen avers that, "[b]y enacting Bill [725] City Council authorized the City to enter into [a funding] agreement with the Commonwealth setting terms and conditions for the Commonwealth to provide an amount not less than $170,000,000, including a provision requiring the City to repay the assistance in the event the conditions of the Act are not complied with" (pet. for rev., para. 60); that "Section 4 of Bill [725] provides that if any of the conditions of the grant are violated, the City will be responsible for repaying the grant in its entirety[,]" (pet. for rev., para. 62); that, therefore, "Petitioner and the City Council will be barred from denying funds for stadium repairs and renovations whenever demanded by the teams and the Mayor knowing that it will be obliged to appropriate $170,000,000 to the Commonwealth if said repairs are not made" (pet. for rev., para. 63); and that this "obligation further restricts and impairs Petitioner['s] . . . lawful discretion in appropriating or declining to appropriate funds as required under the Home Rule Charter." (Pet. for rev., para. 64).

In **count six** of the petition, Cohen avers that, "[u]nless the said Ordinances and Leases described herein are declared by this Court to be invalid, bonds will be sold, land will be purchased, and buildings demolished at a cost of hundreds of millions of dollars for which the City will be ultimately liable" (pet. for rev., para. 67); that Cohen "has taken every step possible without resorting to litigation to prevent the diminution and dilution of his Charter mandated powers and duties[,]" (pet. for

rev., para. 68), including, "voting against the ordinances" and "calling upon the City Solicitor to provide binding assurances that the legislation would not be construed by the teams and the City to provide them with unlimited discretion to commit the Council to appropriate funds." (Pet. for rev., para. 69). Cohen further alleges that this obligation restricts and impairs his discretion with respect to the appropriation of funds (pet. for rev., para. 71) and that, unless this Court declares Ordinances 721–A, 722–A, 725, 729, 730, 731, and 010333 to be void, his rights and the rights of the voters who elected him to office will be impaired and defeated. (Pet. for rev., para. 72).

Therefore, Cohen requests that this Court (1) declare Ordinances 721–A, 722–A, 725, 729, 730, 731 and 010333 and all leases and other agreements made pursuant thereto null and void; (2) alternatively, declare that neither the City nor PAID make available more than $394 million pursuant to these ordinances unless authorized by City Council; (3) permanently enjoin Respondents from making or acting on any and all contracts, leases and agreements pursuant to these ordinances, (4) award Cohen costs, including attorney fees; and (5) grant any other necessary and proper relief.

By their preliminary objections, Respondents seek to dismiss the instant petition for review, variously alleging legal insufficiency and lack of jurisdiction pursuant to Pa. R.C.P. No. 1028(a)(1), (a)(4), and (a)(5).[9] In his Answer, Cohen, of course, asks that this Court overrule Respondents'

9. Pa. R.C.P. No. 1028 provides in part as follows:

 **(a)** Preliminary objections may be filed by any party to any pleading and are limited to the following grounds:

 (1) lack of jurisdiction over the subject matter of the action or the person of the defendant, improper venue or improper

form or service of a writ of summons or a complaint;

 . . . .

 (4) legal insufficiency of a pleading (demurrer); and

 (5) lack of capacity to sue; nonjoinder of a necessary party or misjoinder of a cause of action[.]

preliminary objections with respect to all counts of his complaint.

We begin our discussion by noting that, in reviewing preliminary objections in the nature of a demurrer, we must accept as true all well-pled facts, which are material and relevant, as well as all inferences reasonably deducible therefrom. *Penn Title Insurance Co. v. Deshler*, 661 A.2d 481, 482–483 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 543 Pa. 699, 670 A.2d 145 (1995). And, in deciding whether to sustain a demurrer, this Court is not required to accept as true legal conclusions, unwarranted factual inferences, allegations that constitute argument, or mere opinion. *Id.* at 483. Moreover, a demurrer will not be sustained unless the Court finds that on the face of the complaint the law will not allow recovery; furthermore, any doubts are to be resolved against sustaining the demurrer. *Id.*

## I.

With respect to **count one,** Respondents demur to the complaint based on the fact that Ordinances 721–A and 722–A are as specific as the law requires and that they do not wrongly delegate City Council's legislative prerogative.

Succinctly, Respondents argue that there is no provision in the City's Home Rule Charter mandating the level of specificity that Cohen avers is required with respect to the City's financial contribution to the projects at issue. Respondents further maintain that Cohen's argument that Ordinances 721–A and 722–A, and the lease agreements that they authorize, are not sufficiently specific can be "boil[ed] down" to the contention that the ordinances are inadequate due to their failure to establish beforehand the interest rate for bonds that were to be issued at a later date. Moreover, Respondents assert that Cohen's claim that Ordinances 721–A and 722–A are not valid because both the Mayor and the City Solicitor could significantly increase the City's obligations is not justiciable and is unsupported.

It is, of course, beyond cavil that the legislative authority of the City is exclusively vested in and is to be exercised by the City Council pursuant to the express provision of the Philadelphia Home Rule Charter. 351 Pa.Code § 1.1–101. It is also undisputed that the executive and administrative authority of the City is to be solely vested in and exercised by the mayor and other officers as are empowered by the Charter. 351 Pa.Code § 1.1–102. While no ordinance is to be effective until it is submitted to the mayor, 351 Pa.Code § 2.2–202, the Charter, in outlining the introduction, consideration and passage of ordinances in 351 Pa.Code § 2.2–201, also provides for a multipronged legislative process that culminates in the provision that "[n]o bill shall become an ordinance unless a majority of all the members of the Council be recorded as voting in its favor." 351 Pa.Code § 2.2–201(7).

While we agree with Cohen that 351 Pa.Code § 2.2–300 [10] provides that ap-

---

10. Section 2–300 of the Charter ("The Annual Operating Budget Ordinance") provides in part as follows:

(1) It shall be the duty of the Council, at thirty days before the end of the fiscal year, to adopt the annual operating budget ordinance for the next fiscal year.

. . . .

(2) The annual operating budget ordinance shall provide for discharging any deficit and shall make appropriations to the Council, the Mayor, and all officers, departments, boards and commissions which form a part of the executive or administrative branch of the City government, and for all other items which are to be met out of the revenue of the City. **All appropriations**

propriations shall be made in lump sum amounts and also provides for certain classes of expenditure relating to the executive and administrative branches, we disagree that this section acts as more than a guideline for Council to make appropriations that do not exceed the City's debt limitation. The City's budget document does not contain a line item for each and every specific expenditure under the general lump sum appropriation to the various departments other than by a broad subclassification by class of expenditure. Furthermore, while 351 Pa.Code § 2.2–302,[11] also cited by Cohen, requires a balanced budget, that section of the Charter also does not render Ordinances 721–A and 722–A and the leases entered into thereunder invalid for lack of specificity.

Apparently, Cohen would have us hold that, because the amount of interest on the bonds was not known at the time the ordinances were passed, the legislative process at issue here is invalid. We decline to reach such a conclusion. And, a clear reading of these ordinances demonstrates, as Respondents argue, that they *are* sufficiently specific in any event. Ordinance 721–A, relating to the Eagles' stadium project, provides that the Eagles' leases shall be crafted in connection with the issuance by PAID of bonds and notes not exceeding the principal amount of $101,500,000. *See* Ord. 721–A, sec. 3; Eagles' Prime Lease at 4. Ordinance 722–A, relating to the Phillies' ballpark project, provides that the Phillies' leases shall be made in connection with the issuance by PAID of bonds and notes not exceeding the principal amount of $202,500,000. *See* Ord. 722–A, sec. 3; Phillies' Prime Lease at 4. While these amounts do not include monies for, *inter alia*, capitalized interest and just compensation finally determined to be owed to condemnees, they nevertheless indicate a level of precision and planning that contravenes Cohen's allegations.

As Respondents point out, all terms of the bonds and their interest rates must be approved by the City's Director of Finance, *see* Ord. 721–A, sec. 7; Ord. 722–A, sec. 7;[12] and the Prime Leases entered

---

shall be made in lump sum amounts and according to the following classes of expenditures for each office, department, board or commission:
 (a) **Personal services;**
 (b) **Materials, supplies and equipment;**
 (c) **Debt service;**
 (d) **Such additional classes as the Mayor shall recommend in his proposed annual operating budget ordinance.**
351 Pa.Code § 2.2–300 (emphasis added).

**11.** Section 2–302 of the Charter ("Balancing the Budget") provides the following:
 Not later than the passage of the annual operating budget ordinance, the Council shall ordain such revenue measures as will, in the opinion of the Mayor, yield sufficient revenue to balance the budget. For this purpose new sources of revenue or increased rates from existing sources of revenue not proposed by the Mayor shall be deemed to yield in the ensuing fiscal year such amounts as the Mayor shall determine. The annual operating budget ordinance shall not become effective and the City Controller shall not approve any order for any expenditure thereunder until the Council has balanced the budget.
351 Pa.Code § 2.2–302.

**12.** Section 7 in both of these ordinances provides as follows: "All terms of the Bonds, the Indenture and credit facility and/or liquidity facility and/or reimbursement agreement and swap agreement, if any, shall be subject to the approval of the Director of Finance." We note that, according to Section 6–105(e) of the Charter,

 [t]he Director of Finance shall:
 . . . .
 (e) prepare and supply to the Mayor such information as will enable the Mayor to keep currently acquainted with the financial conditions and prospective receipts and expenditures of the City during the current fiscal year in order to control expenditures in such a manner as to avoid deficits.
351 Pa.Code § 6.6–105.

into under the ordinances limit the terms of the bonds to thirty years. *See* Eagles' Prime Lease at 4; *see also* Phillies' Prime Lease at 4. Further, with respect to another major cost to the City, we agree with Respondents that Ordinance 721–A provides a specific schedule for the City's funding of PAID's operating and maintenance contributions to the Eagles' stadium. In this regard, Exhibit A to the Eagles' Sublease Lease Terms, which exhibit is captioned "Eagles Operating and Expense Reimbursement," sets forth the precise amounts that PAID will owe for operation and maintenance costs by July 15th of each year, starting in 2003 and ending in 2027.

In response to Cohen's claim in count one that Section 19.15 of the Prime Leas-

es [13] "was intended, and in fact does authorize, the Executive Branch and the teams to agree to any further spending commitment they desire over the potential 80 year term of the Lease without consideration by, or approval of, the Council[,]" (pet. for rev., para. 22), we first observe that the parties to the Prime Leases are PAID and **the City,** not the mayor and the Teams, and further agree with Respondents' argument that Section 19.15 merely allows the City, not the mayor and PAID, "to enter into certain amendments to the Prime Leases without the consent of the Teams, bondholders and lenders" (Respondents' brief at 25) (footnote omitted); if any such amendments would require City Council's approval under the Charter, then such approval would still be necessary.[14]

**13.** Section 19.15 of the Prime Leases provides the following:

> *Amendments.* The parties hereto [the City and PAID], from time to time may enter into any amendments hereto (which thereafter shall form a part hereof) without the consent of any other parties, only for the following purposes:
>
> (a) To cure any ambiguity, defect or omission herein or in any amendment hereto or to supplement any provision hereof, provided such cure shall not materially adversely affect the [Teams], the Bondholders or the Credit Facility Provider under the Indenture; or
>
> (b) To reflect a change in Applicable Law which shall not impair the security hereof or materially adversely affect the rights of the Bondholders, the Eagles, or the Credit Facility Provider under the Indenture; or
>
> (c) To provide for additional Rent hereunder to the extent necessary in connection with the issuance of additional debt; or
>
> (d) To add to the covenants and agreements of the City herein contained, or to surrender any right or power herein reserved to or conferred upon the City which shall not impair the security hereof nor materially adversely affect the rights of the [Teams], Bondholders or the Credit Facility Provider under the Indenture.

**14.** We are further in agreement with Respondents that, even if Cohen is correct that the

rents for the renewal of the Team Subleases were redirected from PAID to DRPA, where PAID, not the City, was originally to receive these rents from the Teams, the question of City Council approval is not properly at issue.

As for Cohen's allegation regarding the loss of $500 thousand in "annual" rent by each team at each five-year renewal of the leases at the end of their thirty-year initial terms, and his claim that these rents will be lost **to the City** because this money has been redirected to repay a loan for an unstated amount from the DRPA "for stadium purposes" to an unidentified entity, his argument is totally without merit. We so state because (1) no facts were pled in the petition to identify any particulars about the loan from DRPA or how the City was involved therein; (2) any such agreement would involve only PAID, not the City, because the $500–thousand annual rents were to be made to PAID, not the City; (3) no explanation is given as to how, or why, funds of the DRPA are required to be paid to the City (Cohen argues only that this "rental income, which by all rights should belong to the City[,]" (Cohen's brief at 21), *should not go to* PAID); and (4) any such rental income from the Teams will only be made *if* they renew their leases thirty years from now; thus, no harm, if any there is, could occur unless and until such eventuality comes to pass. *See Van Doren v. Mazurkiewicz,* 695 A.2d 967, 971

Although Cohen replies that Respondents' argument with regard to Section 19.15 is specious, given that Respondents "have already obtained Council's approval for the City to spend whatever the leases call for," (Cohen's brief at 16) we believe that Cohen's analysis is inherently untenable, since one cannot well argue, in simultaneous fashion, that City Council's legislative authority with regard to the stadium projects has been delegated away **and** that Council **has already** authorized any expenditures the leases require. Moreover, there is nothing pled in the petition that at all indicates the City Solicitor intends to act in any way inconsistent with his or her responsibilities under the ordinances and the City's Home Rule Charter. And, "it is to be presumed that municipal officers properly act for the public good. . . ." *Weber v. City of Philadelphia*, 437 Pa. 179, 183, 262 A.2d 297, 300 (1970) (citations omitted).

Cohen holds up Section 17.2 of the Lease-back Lease Agreements [15] as proof that the drafters of the documents knew how to ensure City Council's power with respect to the lease amendments, and he argues that, obviously, they did not protect this power with respect to the Prime Leases. While Section 17.2 of the Lease-back Leases, unlike Section 19 of the Prime Leases, contains language expressly requiring Council approval before PAID could "materially adversely affect [its] obligations" as landlord under the Team Subleases, we agree with Respondents that,

where the City and PAID's rental obligations to one another are inextricably intertwined, Section 17.2 gives Council virtual authority over any amendments that might affect the City's rental obligations pursuant to the Prime Leases. And, although Section 6 of Ordinances 721–A and 722–A provides that the City Solicitor has authority to alter the provisions of the Eagles' and Phillies' leases, this Court certainly does not view this language as delegating away City Council's authority in contravention of the Home Rule Charter where Section 4–400(c) clearly empowers the Law Department to "prepare or approve all contracts, bonds and other instruments in writing in which the City is concerned." 351 Pa.Code § 4.4–400(c).

In answer to Respondents' assertion that Cohen has not yet incurred harm, and, therefore, his complaint should be dismissed, Cohen relies on *Ameron, Inc. v. United States Army Corps of Engineers*, 809 F.2d 979 (3d cir.1986), which holds that, in a separation of powers context, just as in a First Amendment [16] setting, if the power merely to **threaten** to behave in a particular way affects the exercise of constitutional rights, then the existence of such power is ripe for judicial review. *Id.* at 987. We do not believe that *Ameron* is instructive in this case, however. Instead, in our opinion, Cohen has not sufficiently alleged *any threat* to the legislative power of City Council, or to his authority as a councilman *per se*, in contravention of the Charter that would render this case justi-

(Pa.Cmwlth.1997) (stating that "[t]he ripeness doctrine is . . . premised on the notion that '[j]udicial machinery should be conserved for problems which are real and present or imminent, not squandered on problems which are abstract or hypothetical or remote.' ") (Citations omitted).

15. Section 17.2 of the Lease-back Lease Agreements provides as follows:

The Authority shall not amend, modify, alter, assign or otherwise change the [Phillies/Eagles] Lease once fully executed in any way which would materially adversely affect the obligations of the Authority, as landlord, to be set forth in the [Phillies/Eagles] Lease without the prior written consent of the City acting through City Council.

16. U.S. CONST., amend. 1.

ciable on the merits under count one. Because judicial restraint, rather than judicial intervention, should guide this Court in determining whether the municipal officials' actions were proper, *Brletic v. Municipality of Monroeville,* 64 Pa.Cmwlth. 431, 440 A.2d 686 (1982) (relying on *Weber*), we do not believe that Cohen has made a *prima facie* case for recovery under ᵤnis first count. Accordingly, Respondents' demurrer to count one is sustained.

## II.

With regard to **count two,** Respondents demur to the complaint based on the fact that 351 Pa.Code § 8.8–200 authorizes the City to enter into long-term contracts with authorities like PAID. Respondents also demur to the complaint because, they assert, Ordinance 010333, authorizing the City to enter into non-disturbance agreements with the Teams, does not affect the validity of Ordinances 721–A and 722–A and Cohen has *no* standing to challenge Ordinance 010333, since he voted for it.

■ We begin by quoting Section 8–200(3) of the Charter, which provides as follows:

Contracts may be made for the leasing of real estate and for personal property to be supplied or services to be rendered over a period of more than one year only when permitted by ordinance. Otherwise no contract shall be binding upon the City unless there is an appropriation available for its payment. When the term of a contract exceeds

four years, there shall be inserted a clause reserving to the City the right to terminate it at the option of the City at any time after the expiration of four years without liability to the other party for damages or loss of profits which would have been realized had the contract not been terminated. **The limitations of this paragraph shall not apply to any contract entered into between the City and any authority.**

351 Pa.Code § 8.8–200(3) (emphasis added). Based on this express language, found in the last sentence of the subsection, there is no doubt that the four-year "opt out" requirement of the Charter, with respect to contracts to which the City is a party, is not applicable in this matter involving PAID. The Commonwealth and its local agencies are not strangers to the construction of public projects by way of municipal authorities, *see, e.g., Basehore v. Hampden Industrial Development Authority,* 433 Pa. 40, 248 A.2d 212 (1968); *Conrad v. City of Pittsburgh,* 421 Pa. 492, 218 A.2d 906 (1966); *Giordano v. Ridge,* 737 A.2d 350 (Pa.Cmwlth.1999), and Cohen's bald allegation that "PAID in reality is no more than a straw party to these contracts" (pet. for rev., para. 35) is completely unmeritorious. *See* G. Robert Morris, Jr., *Evading Debt Limitations With Public Building Authorities: the costly subversion of State Constitutions,* 68 Yale L.J. 234 (1958).

■ As for Cohen's argument that the non-disturbance agreements [17] authorized

---

**17.** These non-disturbance agreements provide, *inter alia:*

The [Team] Lease and all rights created thereunder shall remain in full force and effect; the City [and PAID] and all Subsequent Owners and Subsequent Holders shall recognize and give full effect to the [Team] Lease and the [Team's] rights thereunder; and whichever of the City, City [and PAID] any subsequent Owner or any Subse-

quent Holder becomes the holder of the interest of the landlord in the [Team] Lease (hereinafter a *"Successor Landlord"*) will be deemed to be in direct privity of estate and contract with the [Team] under the [Team] Lease with the same force and effect as though the [Team] Lease was originally made by the Successor Landlord in favor of the [Team].

by Ordinance 010333 invalidate Ordinances 721–A and 722–A because these agreements provide that, should the City stand in for PAID as a direct landlord to the Teams, the City would be bound to the contracts with the Teams for thirty to eighty years, we disagree that Cohen has sufficiently alleged a basis for recovery. Rather, these agreements, taken in tandem, merely provide that, if PAID is no longer a party to the Ground, Prime and Lease-back Leases, some successor landlord (*perhaps* the City) will be bound by the terms of the Team Subleases. Again, Cohen has not alleged any violation of the Home Rule Charter that has actually occurred due to the passage of Ordinances 721–A and 722–A, and we hold that Ordinance 010333 does not automatically violate the Charter. As Respondents assert, even if PAID were one day no longer the direct landlord of the Teams, another authority could always be appointed in its stead, *see* Team Subleases, § 9.6.[18] Respondents' demur to count two is sustained.

### III.

With respect to **count three,** Respondents demur to Cohen's complaint that Ordinances 729, 730 and 731 [19] improperly authorized the acquisition of land without a price limitation because, according to Respondents, neither the Charter nor any other law requires City Council to approve a specific price for all real estate obtained by the City; all three of these ordinances

authorize that real estate may be obtained by condemnation; and, in any event, City Council, in Ordinances 723 and 724, specifically appropriated $100 million just so that land could be obtained for the project.

Section 5–900(a)(4) of the Home Rule Charter provides as follows:

The Department [of Public Property] shall, whenever authorized by ordinance, purchase, condemn in the manner provided by law, lease or otherwise acquire such grounds, buildings and building accommodations, structures and facilities as may be required by the City; and whenever any City real estate is not being used in connection with the work of any department, board or commission of the City or any other governmental agency, the Department may rent, or when authorized by the Council, sell the same upon the best terms obtainable after appropriate public advertising and the receipt of competitive bids.

351 Pa.Code § 5.5–900(a)(4).

 Although Cohen argues that "the clear implication" of Section 5–900(a)(4) "is that Council must know and also approve the price" of every real estate purchase (Cohen's brief at 33), Cohen does not cite this Court to any law that actually supports his assertion. For example, even the closest reading of the above-quoted section of the Charter fails to buttress Cohen's contention that Council must know in advance the price of all land acquisitions by the Department of Public Property that are authorized to be acquired by ordi-

---

**18.** This section provides, *inter alia,* that "the City and the Authority shall be permitted to sell, assign, Transfer or convey this Agreement or any interest in or under this Agreement or in or to the Stadium Premises (or any part thereof) to the other or to any other governmental or quasi-governmental or public agency, authority, body or entity with the requisite powers to satisfy the Authority's obligations under this Agreement."

**19.** Each of these ordinances provides in part: "SECTION 1. The Commissioner of Public Property, on behalf of the City of Philadelphia, is hereby authorized to acquire by amicable negotiations or by condemnation, fee simple title to a certain parcel of real estate with the improvements situated thereon...." Ords. 729; Ord. 730; Ord. 731.

nance. Moreover, we agree with Respondents that Ordinances 729, 730 and 731 authorize the acquisition of land for stadium purposes by condemnation and Cohen himself avers that the amount of just compensation cannot be known at the time condemnation occurs. (Pet. for rev., para 44). And, even if Section 5–900(a)(4) supported Cohen's contention that Council was required to approve in advance a specific purchase price for each piece of real estate acquired by ordinance (either through amicable negotiation or condemnation), as Respondents point out and Cohen does not disagree, the City specifically allotted $100 million for land acquisition in Ordinances 723 and 724,[20] the validity of which ordinances Cohen does not challenge here. Respondents' preliminary objection to count three is therefore sustained.

### IV.

▇▇▇▇ Respondents demur to **count four** on the basis that Cohen is improperly questioning City Council's vote to greenlight the stadium project because he believes the City has worthier financial concerns, and this type of challenge cannot properly be determined by the courts. Cohen, however, argues that count four *is* legally sufficient because the mayor and City Council breached their fiduciary duty and Respondents negotiated a deal in which the public gets almost nothing, but private entities, *viz.*, the Teams' owners, get $1.3 billion. In this regard, Cohen cites, *inter alia, Price v. Philadelphia Parking Authority,* 422 Pa. 317, 221 A.2d 138 (1966) and *Kulp v. City of Philadelphia,* 291 Pa. 413, 140 A. 129 (1928), for the proposition that City subsidies to private corporations that fail to afford a substantial public benefit will not be upheld.

While, at first blush, the 1928 decision in *Kulp,* which concerned the City's subsidy by ordinance of $25,000 to a private corporation, the Civic Opera Company, appears rather similar to the case at bar, and this Court must look to past authority for resolution of this issue, we believe that the Supreme Court's more recent decision in *Conrad* answers our concern more than *Kulp.* In *Conrad,* the City of Pittsburgh, desiring to provide its residents with a facility for civic and athletic events, created and organized the Stadium Authority of the City of Pittsburgh for the purpose of constructing a public stadium facility. The stadium came to be known as Three Rivers Stadium and the Stadium Authority was to sublet the stadium to the Pittsburgh Athletic Co., Inc. (the Pittsburgh

---

**20.** Ordinance 723 provides in part as follows:
*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*
SECTION 1. The Ordinance approved April 11, 2000 (Bill No. 000003) relating to the Capital Program for the six Fiscal Years 2001–2006 is hereby amended by adding a project and an amount as follows:
DEPARTMENT OF PUBLIC PROPERTY
By adding under the category "Buildings and Facilities" a project, Line 93H, "Sports Complex–Land Acquisition" in the amount of one hundred million ($100,000,000) dollars in the columns labeled 2001 and 2001–2006 from Other Governments/Agencies.
Ordinance 724 provides in part as follows:

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*
SECTION 1. The Ordinance approved April 11, 2000 (Bill No. 000004) relating to the Fiscal 2001 Capital Budget is hereby amended by adding a project and an amount in the Department of Public Property as follows:
DEPARTMENT OF PUBLIC PROPERTY
By adding under the category "Buildings and Facilities" a project, Line 93H, "Sports Complex–Land Acquisition" in the amount of one hundred million ($100,000,000) dollars in the column labeled 2001 from Other *Governments/Agencies.*

Pirates), a major league baseball franchise, and the Pittsburgh Steelers Football Club, Inc., in the NFL. The obligation of the City of Pittsburgh, in addition to providing the site upon which the stadium was to be constructed and to loan certain sums to the Stadium Authority, was to make payment to the Authority from current revenues if the Authority incurred an operating deficit. The Supreme Court held that contracts which create obligations not exceeding current revenues do not constitute debt within the contemplation of the Pennsylvania Constitution and also rejected a challenge by the taxpayer plaintiff, and the Civic Club of Allegheny County as *amicus,* that the construction and use of the stadium was not in the public need and was not a proper use of municipal authority because it would provide " 'luxury service rather than an essential service.' " *See Conrad,* 421 Pa. at 507, 218 A.2d at 914 (Musmanno, J., concurring). The evocative prose of Justice Musmanno in his concurring opinion is worth repeating here:

If a well governed city were to confine its governmental functions merely to the task of assuring survival, if it were to do nothing but provide "basic services" for an animal survival, it would be a city without parks, swimming pools, [a] zoo, baseball diamonds, football gridirons and playgrounds for children. Such a city would be a dreary city indeed. As man cannot live by bread alone, a city cannot endure on cement, asphalt and sewer pipes alone. A city must have a municipal spirit beyond its physical properties, it must be alive with an esprit de corps, its personality must be such that visitors—both business and tourist—are attracted to the city,

pleased by it and wish to return to it. That personality must be one to which the population contributes by mass participation in activities identified with that city.

*Id.* at 508, 218 A.2d at 914.

The fact that the Teams' owners will accrue a substantial private benefit is no reason to declare the City's contributions to the stadium project invalid where a substantial public benefit will also inure. *See, e.g., Basehore* (a consolidated case in which taxpayers contested the constitutionality of, *inter alia,* the Industrial and Commercial Development Authority Law, Act of August 23, 1967, P.L. 251, *as amended,* 73 P.S. §§ 371—386,[21] and agreements entered into between certain industrial development authorities and private corporations). As our Supreme Court stated in *Basehore:*

The taxpayers' main concern is that the party who is really benefiting from this program is the private manufacturer who acquires an industrial plant at a much lower cost than he would have incurred had he built it himself. **It is beyond question that private manufacturers receive a very large benefit from this program; however, this fact alone should not invalidate the program.** If the legislative program is reasonably designed to combat a problem within the competence of the legislature and if the public will benefit from the project, then the project is sufficiently public in nature to withstand constitutional challenge.

433 Pa. at 50, 248 A.2d at 217 (emphasis added). In reaching its decision, the *Basehore* Court distinguished *Price,* relied on

---

**21.** The 1993 amendment to this act substituted "Economic Development and Financing Law" for "Industrial and Commercial Development Authority Law." *See* the Historical and Statutory Note following Section 1 of the Economic Development and Financing Law, 73 P.S. § 371, and note 4 *supra.*

by Cohen, because, in *Price,* not only was there not a substantial public benefit, but the agreements therein violated the Parking Authority's enabling act, which was a different enabling act than in *Basehore,* where there was no conflict between the enabling act and the projects at issue. 433 Pa. at 53, 248 A.2d at 219. Although, in the matter *sub judice,* Cohen complains that, mainly, two private interests will substantially benefit from the City's appropriation of funds for stadium purposes and that there are other, better ways for the City to expend its money, in our estimation, Cohen has not actually shown that the City's appropriations will not satisfy a substantial public purpose and that, indeed, the mayor and City Council have breached their fiduciary duty. Although Cohen's priorities and those of the mayor may be entirely different, that fact does not result in a conclusion that the civic appropriateness of the expenditure is not an authorized investment in the City's future. *See Conrad.*

More recently, the Supreme Court decided *Allegheny Institute Taxpayers Coalition v. Allegheny Regional Asset District,* 556 Pa. 102, 727 A.2d 113 (1999), a case concerning yet other challenges to a funding plan providing long-term public financing for the separate stadiums for the Pittsburgh Steelers and Pittsburgh Pirates, along with improvements to the Pittsburgh convention center. In *Allegheny,* the common pleas court dismissed challenges to the funding plan, and, in exercising its King's Bench powers, the Supreme Court upheld that decision as follows:

> In sum, despite the multitude of claims that [Allegheny Regional Asset District] acted illegally, the crux of these cases appears to be a challenge to the wisdom and judgment of [Allegheny Regional Asset District] in adopting the resolution which would finance a bond

issue by dedicating $402,000,000 in future sales tax revenues through the year 2030 in order to fund two professional sports franchises. Our scope of review, however, does not extend to the wisdom or discretion of [Allegheny Regional Asset District] and its board members. Our scope of review is of the statutory authority and regularity of the challenged [Allegheny Regional Asset District] board resolution without substituting our individual views of the prudence of the resolution. Having found no statutory violation or other error of law, we must affirm the trial court's dismissal of the complaints.

556 Pa. at 113–114, 727 A.2d at 119.

Apart from the obvious fact that the procedural postures differ (*i.e.,* the matter before us is in our original jurisdiction), *Allegheny* holds true, and we believe that in the case presently before us, this Court must not adjudicate what amounts to the legislative discretion of City Council. Accordingly, Respondents' preliminary objection to count four is sustained.

## V.

■ With regard to **count five,** Respondents demur on the basis that, while Section 504(5) of the Debt Enabling Act, 72 P.S. § 3919.504(5), requires either the City or PAID to contract with the Teams to ensure that either the Teams, PAID or the City is responsible for the facility's capital improvements and operating expenses, and not the Commonwealth, with a limited exception in which PAID must contribute to the cost of maintenance and capital repairs of the Eagles' stadium, the Sublease Lease Terms clarify that it is the **Teams** who are responsible for such improvements and operating expenses. Therefore, according to Respondents, Cohen's averment that use of the Capital

Facilities Debt Enabling Act, because it obligates only the City to repay the $170 million to the Commonwealth if repairs are not made, deprives him and Council of their right to legislate and appropriate under the Charter, where he and Council will be required to appropriate City funds for stadium repairs and renovations or the City will have to return at least $170 million to the state if the repairs required by the Act are not made, must fail.

Section 504(5) of the Debt Enabling Act provides as follows:

In order for grants of Commonwealth funds to be used to construct or renovate a facility, the contracting municipality or contracting authority must contract with the professional sports organization to ensure compliance by the professional sports organization with the following terms and conditions:

. . . .

(5) Agreement that during the term of the lease for the facility, **the professional sports organization or the contracting municipality or contracting authority** shall be responsible for all capital improvements to the facility and for all operating expenses relating to the use of the facility, including security,

cleaning, insurance, maintenance and utilities.

72 P.S. § 3919.504(5) (emphasis added).

Moreover, Section 4 of Ordinance 725 sets forth the following provision:

The Director of Commerce is authorized to enter into an agreement with PAID **committing the City and/or its designated project recipients** to reimburse the Commonwealth for the Commonwealth's share of any expenditures awarded pursuant to this Ordinance which are found by the Office of the Budget to be ineligible.

Ord. 725, sec. 4 (emphasis added).

Although Cohen argues that this section of Ordinance 725 provides that **the City** must return state funds if the conditions of the grant are violated, even a cursory reading of section 4 establishes that this contention is simply not so, where, alternatively, "designated project recipients" are mentioned. Moreover, a review of the Sublease Lease Terms, attached to Ordinances 721–A and 722–A, provide that, with the limited exception mentioned above, it is the Teams that will be responsible for the costs of capital improvements and operation of the facilities.[22] There-

---

**22.** Exhibit D to Ordinance 721–A, which exhibit is the Terms and Conditions for the Eagles' Sublease, provides as follows:

Operations and Maintenance[:]
The Team will be responsible for all operation and maintenance expenses of the Stadium except that PAID shall pay the amounts set forth on the Schedule attached hereto as Exhibit "A" not later than July 15 of each year.
Sublease Lease Terms at 5.
Capital Repairs:
Team shall be responsible for all capital repairs, replacements or improvements to the Stadium. PAID will make a one time payment of Ten Million Dollars ($10,000,-000) as a contribution to capital repairs, replacements or improvements to be paid not later than the date of the issuance of its

bonds or June 15, 2001. To the extent the account, including interest earnings, is not sufficient to pay for capital repairs and replacements or improvements, the excess of such costs shall be the responsibility of the Team.
*Id.* at 7.
Exhibit D to Ordinance 722–A, which exhibit is the Terms and Conditions for the Phillies' Sublease, provides as follows:
Operations and Maintenance:
Team will be responsible for all operation and maintenance expenses of the Ballpark.
Sublease Lease Terms at 5.
Capital Repairs:
Team shall be responsible at its cost and expense for all capital repairs, replacements or improvements to the Ballpark.
*Id.* at 7.

fore, Cohen's argument that his legislative authority has been compromised by use of the Debt Enabling Act to fund the stadium project is unavailing, and Respondents' demur to count five is sustained.

## VI.

With respect to **count six,** Respondents demur because, they say, Cohen cannot properly come to this Court and contest a vote he previously lost as to the stadium project. Respondents also demur to this count because "a court should not issue an injunction" that "would work a grave injustice" on the City's taxpayers. While, in his Answer, Cohen agrees with this last statement, he nevertheless asserts that the entry of an injunction in this case would counter the injustice wreaked upon the City's taxpayers by the wrongful appropriation of $1.3 billion.

This last count, in seeking declaratory and injunctive relief, essentially relies on the five previous counts of the complaint, all of which we have already deemed to be unmeritorious. Accordingly, we will sustain Respondents' preliminary objection to this count as well.

Therefore, even accepting all of Cohen's material allegations as true, Respondent's preliminary objections in the nature of a demurrer are hereby sustained, and Cohen's petition for review is dismissed.

### ORDER

AND NOW, this 19th day of August, 2002, Respondents' preliminary objections to Petitioner's petition for review in the nature of a complaint for declaratory judgment and permanent injunction are hereby sustained, and Petitioner's petition for review is dismissed, with prejudice.

Each party to pay own costs.

DISSENTING OPINION BY Judge SMITH–RIBNER.

I dissent from the majority's decision to sustain Respondents' preliminary objections in the nature of a demurrer to Count 1 of Petitioners' petition for review in the nature of a complaint for declaratory judgment. While I recognize that the Pennsylvania Supreme Court has spoken on the issue of the legality of requiring taxpayers to defray the cost of building sports stadiums, that court's decisions do not of necessity preclude declaratory judgment relief on the issue raised in Count 1. That issue involves the claim of unlawful delegation to the Mayor and/or the City Solicitor to unilaterally increase the financial obligations of the City of Philadelphia in connection with the construction and maintenance of the new sports facilities without appropriation and authorization by City Council.

In ruling on preliminary objections in the nature of a demurrer, this Court must accept as true all well pled facts and reasonable inferences from those facts, and it must determine whether the facts as pled are legally sufficient to permit the action to proceed. *Allegheny Sportsmen's League v. Ridge,* 790 A.2d 350 (Pa.Cmwlth. 2002). It must appear with certainty that the law will permit no recovery, and any doubt must be resolved in favor of refusing to sustain the preliminary objections. The facts presented in this case if accepted as true raise a question of whether the Ordinances and/or lease provisions unlawfully delegate appropriation power reserved by the Philadelphia Home Rule Charter solely to City Council. Nothing precludes this Court from following well-settled law and considering Respondents' demurrer to Count 1 in accordance with the standards clearly articulated by the courts. Furthermore, the notion that Councilman Cohen is barred from challenging the illegal delega-

tion of appropriation power because he lost the vote before City Council is a notion that is supported neither by case law nor by logic.

Judge FRIEDMAN joins in this dissenting opinion.