**PENNSYLVANIA DEPARTMENT OF BANKING, and Commonwealth of Pennsylvania, Acting by Attorney General Thomas W. Corbett, Jr., Plaintiffs**

v.

**NCAS OF DELAWARE, LLC, d/b/a Advance America Cash Advance Centers, and Advance America Cash Advance Centers, Inc., Defendants.**

Commonwealth Court of Pennsylvania.

Argued Nov. 5, 2009.

Decided April 28, 2010.

John M. Abel, Sr. Deputy Attorney General, Harrisburg and Robert L. Byer, Pittsburgh, for plaintiffs.

David H. Pittinsky, Philadelphia, for defendants.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, PELLEGRINI, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge McGINLEY.

Presently before this Court are the preliminary objections (P.O.s) of NCAS of Delaware, LLC (NCAS)[1], Advance America Cash Advance Centers (Advance America)[2], and Advance America Cash Advance Centers, Inc (AA)[3] (collectively, Defen-

---

**1.** NCAS is a "Delaware limited liability company that was engaged in the lending business throughout the Commonwealth...." Amended Complaint, December 16, 2008, Paragraph 8 at 4.

**2.** Advance America is a fictitious name used by NCAS to conduct loans in Pennsylvania "and is registered as a foreign business corporation with the Commonwealth of Pennsylvania, Department of State, and Corporations Bureau ..." *See* Plaintiffs' Brief in Opposition to Defendants' Preliminary Objections to the Amended Complaint at 4 and Amended Com-

plaint, Paragraph 8 at 4. **The Pennsylvania Department of Banking's (Department) allegations are against "Advance America" in Count 1 and Count 2 of the Amended Complaint. Therefore, this Court shall use the word "Advance America" and the "Department" when addressing the P.O.s to those counts.**

**3.** AA is a "Delaware corporation with its corporate headquarters at 135 North Church Street, Spartanburg, South Carolina 29306." Amended Complaint, Paragraph 9 at 4. "Advance America is a wholly owned subsidiary

dants) to the amended complaint filed by the Department and the Attorney General (collectively, Plaintiffs).[4]

## I. Prior Matter: Original Complaint.

This matter first commenced on September 27, 2006, when the Department filed a complaint against NCAS d/b/a Cash Advance Centers and alleged Cash Advance Centers violated the Consumer Discount Company Act (CDCA)[5] and the Loan Interest and Protection Law (LIPL).[6]

The complaint further alleges that on June 20, 2006, the Cash Advance Centers began to offer a new line of credit product in Pennsylvania that was not in partnership with a bank. Under Cash Advance Centers' new line of credit product, a $500 credit line is provided to qualifying Pennsylvania borrowers. Cash Advance Centers charges interest on the advances in the form of simple interest at a daily periodic rate that corresponds to an annual percentage rate of 5.98%. In addition, Cash Advance Centers charges borrowers a monthly participation fee of $149.50 per month (the Monthly Participation Fee).

... Specifically, Section 3(A) of CDCA, 7 P.S. § 6203(A) prohibits, with respect to loans or advances of money or credit of $25,000 or less, any business that has not obtained a license from the Secretary of Banking under the CDCA from charging, collecting, contracting for or receiving 'interest .... fees ... charges or other consideration' which aggregate in excess of the maximum allowable interest rate that an unlicensed lender would be permitted to charge under Pennsylvania law on the amount loaned or advanced. The Department avers that the line of credit product offered by Cash Advance Centers is a loan or advance of money or credit within the meaning of section 3(A) of the CDCA, 7 P.S. § 6203(A). Cash Advance Centers has not obtained a license from the Secretary of Banking pursuant to the CDCA.

Additionally, the Department alleges pursuant to Section 201 of the LIPL, 41 P.S. § 201, that Cash Advance Centers is prohibited from charging for its line of credit products interest, fees, charges or other consideration which aggregate in excess of six percent (6%). (footnote omitted).

*Pennsylvania Department of Banking v. NCAS of Delaware, LCC (NCAS I)*, 931 A.2d 771, 774 (Pa.Cmwlth.2007), *affirmed*, 596 Pa. 638, 948 A.2d 752 (2008).

Before this Court in *NCAS I* were the Department's motion for judgment on the pleadings and Cash Advance Centers' cross-motion for judgment on the pleadings:

This Court must disagree with Cash Advance Centers' assertions. While Sec-

---

of AA that AA formed for the purpose of conducting trade or commerce in Pennsylvania." Amended Complaint, Paragraph 10 at 4. "AA has conducted trade or commerce in Pennsylvania through Advance America and through another subsidiary using the 'Advance America' brand...." Amended Complaint, Paragraph 11 at 5. The Pennsylvania Attorney General's allegations in Count 3 and Count 4 of the Amended Complaint are against "Advance America" and "AA." **Therefore, this Court shall use the words "Advance America", "AA" and the "Attorney General"** where appropriate when addressing the P.O.s to those counts.

**4.** **This Court shall use the words Plaintiffs and Defendants when addressing the P.O.s in general terms.**

**5.** Act of April 8, 1937, P.L. 262, *as amended*, 7 P.S. §§ 6201–6219.

**6.** Act of January 30, 1974, P.L. 13, *as amended*, 41 P.S. §§ 101–605.

tion 3(A) of the CDCA, 7 P.S. § 6203(A), limits charges on the 'amount actually loaned or advanced', clearly, the Monthly Participation Fee is a necessary condition before Cash Advance Centers provides a credit advance and is paid in connection with any advance. It is a charge inextricably related to the 'amount actually loaned or advanced.' Accordingly, Cash Advance Centers' *unlicensed* lending practices violate Section 3(A) of the CDCA, 7 P.S. § 6203(A). *Department's motion for judgment on the pleadings with regard to the CDCA is granted and Cash Advance Centers' [Advance America's] cross-motion for judgment on the pleadings is denied as to the CDCA.*

. . . .

Unlike Section 3(A) of the CDCA, which provides for the *aggregation of fees and charges,* the plain language of Section 201 of the LIPL, 41 P.S. § 201, makes no mention of the aggregation of fees and charges, but instead refers only to the 'lawful rate of *interest* ' . . . .

*Without the development of an evidentiary record,* this Court is constrained to conclude at this early stage of the proceedings, *the record does not establish that the Monthly Participation Fee of $149.95 should be considered sham interest which, combined with the stated interest rate of 5.98%, establishes a violation of Section 201 of the LIPL, 41 P.S. § 201. Therefore, the Department's motion for judgment on the pleadings with regard to the LIPL is denied.* Similarly, this Court does not have sufficient information before it to conclude that the LIPL does not prohibit Cash

Advance Centers' current lending activities in Pennsylvania and therefore, Cash Advance Centers' *cross-motion for judgment on the pleadings is denied as to the LIPL.*

. . . .

The Department has requested injunctive relief to permanently enjoin Cash Advance Centers from continuing its lending activities in the Commonwealth of Pennsylvania and from collecting on lines of credit or loans currently outstanding in the Commonwealth of Pennsylvania pursuant to the CDCA violation. The Department's requested injunctive relief is granted for as long as the violation of the CDCA continues.[7] (emphasis in original and added and footnote omitted).

*Id.* at 779–81.

## II. Present Matter: Amended Complaint.

On December 16, 2008, Plaintiffs filed an amended complaint and alleged:

. . . .

11. *AA has conducted trade or commerce in Pennsylvania through Advance America and through another subsidiary using the "Advance America" brand ("Subsidiary").* (emphasis added).

. . . .

15. Until March 27, 2006, AA operated in Pennsylvania through the Subsidiary that had registered as a loan broker under the Credit Services Act [8] ... 73 P.S. §§ 2181–2192, in which capacity AA described itself as having operated "as marketing, processing, and servicing

---

7. In *NCAS I,* the permanent injunction enjoined Cash Advance Centers [Advance America] from charging Pennsylvania consumers Monthly Participation Fees and from engaging in any other business practice that violated the maximum interest rate or fee limitations under Pennsylvania law.

8. Act of December 16, 1992, P.L. 1144, *as amended.*

agent of a Federal Deposit Insurance Corporation ("FDIC") supervised institution that offered payday cash advances and installment loans." (Quoting from AA Form 8–K, filed with United States Securities and Exchange Commission June 19, 2006).

16. The FDIC-supervised institution described in paragraph 15, above, was a bank located outside the Commonwealth of Pennsylvania, and AA operated in the above-described manner on the theory that the out-of-state location of the bank would permit the Subsidiary to broker payday loans with interest rates determined by the laws of a state other than the Commonwealth of Pennsylvania pursuant to federal law and to avoid interest rate and fee caps imposed by Pennsylvania law on payday loans that the Subsidiary offered to Pennsylvania residents using this method.

17. As reported in the AA Form ... "the FDIC instructed the lending bank for Pennsylvania ... to discontinue offering payday cash advances and alternative credit products if they could not adequately address the FDIC's concerns. In response to the FDIC's instructions, the lending bank for Pennsylvania ceased its payday cash advance and installment loan originations as of the close of business on March 27, 2006."

*DEFENDANTS' BUSINESS PRACTICES*

18. *On June 20, 2006, Advance America began offering in Pennsylvania a new line of credit product, not in partnership with a bank, in place of its prior payday loan products.* (emphasis added).

19. Under Advance America's line of credit product, Advance America provided a $500 credit line to qualifying Pennsylvania borrowers. Advance America charged interest on these advances in the form of simple interest at a daily periodic rate that corresponds to an annual percentage rate of 5.98%. In addition, Advance America charged borrowers a "Monthly Participation Fee" of $149.95 per month.

. . . .

22. *At all times Advance America offered its line of credit product in Pennsylvania, Advance America was acting as AA's agent.* (emphasis added).

23. *AA directed, supervised, controlled, approved, formulated, authorized, ratified, benefitted from, and participated in Advance America's acts and practices in Pennsylvania.* (emphasis added).

24. *Advance America offered the line of credit product acting in concert with AA* in furtherance of their common efforts and pursuant to a common design with AA to circumvent the maximum interest rate and fee limitations under Pennsylvania law, and with AA's substantial assistance toward this objective. (emphasis added).

25. *Both Advance America and AA benefited financially through Advance America's offering of the line of credit products in Pennsylvania.* (emphasis added).

COUNT I:

*VIOLATION OF THE CONSUMER DISCOUNT COMPANY ACT*

(Commonwealth vs. All Defendants)

. . . .

28. *The line of credit product offered by Advance America was a loan or advance of money or credit within the meaning of Section 3.A of the Consumer Discount Company Act,* ... 7 P.S. § 6203.A (supp.2006). (emphasis added).

29. *Advance America has never obtained a license from the Secretary of Banking pursuant to the Consumer Discount Company Act.* (emphasis added).

30. No other Pennsylvania or federal law applicable to Advance America authorized Advance America to charge a "Monthly Participation Fee" of $149.50 together with an interest rate of approximately 5.98% to consumers for a line of credit product.

31. *Because Advance America was not licensed pursuant to the Consumer Discount Company Act, Advance America was prohibited from charging for its line of credit product interest, fees, charges or other consideration with aggregate in excess of the annual interest rate of 6 per cent under Section 201 of the Loan Interest and Protection Law, Act of January 30, 1974, P.L. 13, 41 P.S. § 201.* (emphasis added).

. . . .

36. *AA is bound by the claims or issues determined by the Order [July 31, 2007], because AA is in privity with Advance America and because Advance America acted as the agent of AA, under AA's control, with AA's authority, and at AA's direction.* (emphasis added).

. . . .

38. Until the Commonwealth Court entered the Order of July 31, 2007, Advance America continued to do business at loan centers throughout the Commonwealth of Pennsylvania.

. . . .

39. By illegally charging consumers of its line of credit product a "Monthly Participation Fee" of $149.50 together with an interest rate of approximately 5.98%, Advance America has injured the economic health and well-being of the Commonwealth's citizens.

. . . .

COUNT II:

*VIOLATION OF THE LOAN INTEREST AND PROTECTION LAW*

(Commonwealth vs. All Defendants)

. . . .

42. Section 201 of the Loan Interest and Protection Law, ... 41 P.S. § 201, provides that the maximum lawful rate of annual interest for the loan or use of money in an amount of $50,000 or less is 6 per cent.

. . . .

44. *In fact, the interest Advance America charged under the line of credit product was much higher than an annual percentage rate of 5.98% because the "Monthly Participation Fee" was a sham, the true nature of which was illegal, usurious interest in violation of the maximum allowable annual interest rate under Section 201 of the Loan Interest and Protection Law, ... 41 P.S. § 201.* (emphasis added).

45. *AA rendered substantial assistance to Advance America to establish loan centers and offer the line of credit product in the Commonwealth knowing that, through the line of credit product, Advance America was charging illegal, usurious interest in violation of the Loan Interest and Protection Law.* (emphasis added).

. . . .

COUNT III:

*VIOLATION OF THE CONSUMER PROTECTION LAW*

(Attorney General vs. All Defendants)

. . . .

49. *Advance America's violation of the Consumer Discount Company Act, as found by the Commonwealth Court, as well as the violations of the Loan Interest and Protection Law, as set forth*

*above, constitute per se violations of Section 2 of the Consumer Protection Law, 73 P.S. § 201–2.* (emphasis added).

. . . .

52. *The above acts and practices constitute unfair methods of competition and unfair and deceptive acts and practices prohibited by Section 201–3 of the Consumer Protection Law[9] by, among other things (emphasis added):*

(a) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(b) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

(c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have; and,

(d) *Engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.* (emphasis added).

. . . .

56. *Advance America and AA have benefited by Advance America's unfair methods of competition and unfair and deceptive acts and practices in the Commonwealth and have retained these benefits unjustly.* (emphasis added).

COUNT IV:
*VIOLATIONS OF THE CONSUMER PROTECTION LAW*

(Attorney General vs. All Defendants)

. . . .

58. Defendants represented to consumers that the finance charge under the line of credit product was 5.98% when in fact the rate was much higher and was disguised as the $149.95 "Monthly Participation Fee" to hide the higher actual rate of interest.

. . . .

61. Defendants have injured the economic health and well-being of the Commonwealth's citizens by illegally charging Pennsylvania consumers an interest rate in excess of that allowed under the Loan Interest and Protection Law and by disguising the actual interest rate as a "Monthly Participation Fee" of $149.50.

62. Advance America and AA have benefited financially, to the detriment of Pennsylvania consumers, by operating illegally in the Commonwealth and have retained these benefits unjustly.

. . . .

65. *The above acts and practices constitute unfair methods of competition and/or unfair and deceptive acts or practices prohibited by Section 201–3 of the Consumer Protection Law by, among other things* (emphasis added):

(a) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(b) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

(c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

9. Act of December 17, 1968, P.L. 1224, *as* *amended,* 73 P.S. § 201–1–201–9.3.

(d) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(e) Advertising goods and services with intent to sell them as advertised; and,

(f) *Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.* (emphasis added).

73 P.S. §§ 201–2(4)(n), (iii), (v), (vii), (ix) & (xxi).

63. [sic][10] *The above conduct on the part of Defendants is illegal and in violation of Section 201-3 of the Consumer Protection Law, 73 P.S. § 201-3* .... (emphasis added).

Amended Complaint, December 16, 2008, Paragraphs 11, 15–19, 22–25, 28–31, 36, 38–39, 42, 44–45, 49, 52, 56, 58, 61–62, and 65–66 at 4–11, 13–14, and 16–18.

### III. Defendants' Preliminary Objections.

Defendants preliminarily objected to the amended complaint and asserted:

....

3. *No statute authorizes the Commonwealth [Department] to seek the monetary relief associated with the violations alleged in Counts I and II of the Amended Complaint.* The statute underlying Count I, the CDCA, does not provide the Commonwealth [Department] with the authority to seek monetary relief in a civil proceeding. *The statute underlying Count II, the LIPL, authorizes monetary damages, including triple the amount of any excess interest charges a borrower may pay, attorneys' fees, and court costs, **but only when awarded in connection with an action brought by an individual borrower acting on his or her own behalf and not on behalf of other borrowers** ....* The LIPL also relieves individual borrowers of the obligation to pay interest on an outstanding loan in excess of that permitted by law.... *Additionally, the LIPL permits the AG [Attorney General] to seek injunctive relief, but not monetary damages* or a declaratory judgment, and only when such relief is necessary "to secure compliance with this act" .... (emphasis in original and added and citations omitted).

4. The other statutes cited in the Amended Complaint in connection with Counts I and II similarly provide no authority for the relief the Commonwealth [Department] seeks. *The Department of Banking Code*[11] ... *merely authorizes an action by the Department for an injunction to restrain a violation of any of the laws under the Department's jurisdiction.... The DOB Code in no way authorizes suits for monetary damages or declaratory judgments.* Similarly, the Commonwealth Attorneys Act ... authorizes the AG [Attorney General] to represent the Commonwealth in lawsuits, but does not provide any affirmative authority to seek damages or declaratory judgments. (citations omitted and emphasis added).

5. The object of the Commonwealth's [Department's] requested declaratory judgment, *i.e.,* preventing NCAS [Advance America] from collecting principal and interest in the amount of 5.98 percent on its loans, also completely lacks statutory and case support. *The CDCA does not create a civil cause of action in*

---

10. Following the sequence of paragraphs, the appropriate paragraph would be 66.

11. Act of May 15, 1933, P.L. 565, *as amended,* 71 P.S. §§ 733–1–733–1101.

*favor of the Commonwealth [Department] and the LIPL merely authorizes the AG [Attorney General] to seek an injunction "to secure compliance with this act ..." (and **not** to prohibit the collection of principal or lawful interest)* .... Similarly, the DOB Code only authorizes the Department to seek an injunction necessary to restrain and prevent a regulated party "from engaging in any activity violating [any law under the Department's jurisdiction]" .... *While these statutes permit the Commonwealth [Department] to bring lenders into compliance with the CDCA and the LIPL, they do not authorize the Commonwealth to seek the sweeping declaratory judgment the Commonwealth requests.* (emphasis added and citations omitted).

. . . .

10. *The Commonwealth [Department] lacks the capacity to sue in parens patriae because it has no quasi-sovereign interest at stake that justifies such standing.* (emphasis added).

11. *The law is clear that a state bringing a suit in parens patriae must establish a quasi-sovereign interest **apart** from the individual interests of a single citizen or group of citizens* .... (emphasis in original and added and citations omitted).

12. *The Commonwealth has failed to articulate any interest that is remotely quasi-sovereign to justify its parens patriae standing* .... (citations omitted and emphasis added).

13. If the potential claims of NCAS' [Advance America] borrowers are set aside, as the *parens patriae* case law directs, the Commonwealth is left with no "concrete," "independent" and "direct" interests to protect .... (citations omitted).

. . . .

15. *Parens patriae* standing is inappropriate in this case because the recognition of a quasi-sovereign interest under the facts as pled could expose NCAS [Advance America] to double liability. Individual customers who have already sued or seek to sue NCAS [Advance America] will surely argue that there is no privity between them and the Commonwealth [Department] and, as a result, any judgment in this litigation would not limit remedies available in such individual litigation

. . . .

## PRELIMINARY OBJECTIONS TO THE ATTORNEY GENERAL'S CLAIMS IN COUNTS III AND IV OF THE AMENDED COMPLAINT ALLEGING VIOLATIONS OF THE UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

*Demurrer Under Pa. R. Civ. P. 1028(a)(4): Counts III and IV Fail to State Claims Under the UTPCPL*

18. In Counts III and IV of the Amended Complaint, the AG [Attorney General] alleges violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL").... Specifically, in Count III, the AG [Attorney General] alleges that NCAS' violation of the CDCA, as found by this Court, and NCAS' alleged violation of the LIPL, on which this Court has not ruled, "constitute *per se* violations of [the UTPCPL]" .... (citations omitted).

. . . .

20. *In Count III of the Amended Complaint, the AG [Attorney General ] alleges that a violation of CDCA and the LIPL is a per se violation of the UTPCPL* ....

21. *This Court has previously rejected the AG's [Attorney General's ] theory*

*that violation of a consumer credit statute constitutes a per se violation of the UTPCPL* .... (citations omitted and emphasis added).

....

24. The General Assembly ensured that consumers' rights under the CDCA and the LIPL could be vindicated by including in those laws (and the Department of Banking Code) a variety of enforcement mechanisms, including a private right of action for consumers who pay interest or charges in excess of those permitted under Pennsylvania law. *See, e.g.,* 41 P.S. §§ 501–504. *However, neither the CDCA, the LIPL nor the Department of Banking Code provides that a violation of one of those laws is automatically and without more a violation of the UTPCPL* .... (emphasis added).

....

26. This Court has made clear that where a particular provision is omitted from a statute but provided for in other similar statutes, the omission of the provision is deemed intentional....

....

30. *The AG claims that NCAS [Advance America] "held itself out" as a lawful lender offering a lawful credit product, see Exhibit A hereto, at [Paragraphs] 50–51, and that by doing so NCAS [Advance America] employed an unfair or deceptive act or practice as defined in subparagraphs (ii),(iii), (v) and (xxi) of 73 P.S. § 201–2(4). See id.* at [Paragraph] 52. This claim is completely without legal merit, since: (1) the AG has not identified—and cannot identify—any representation that NCAS made about the lawfulness of its operation or product; and (2) such a representation cannot be implied from NCAS' placing its product on the market, (emphasis added).

....

34. Pursuant to TILA [Truth–in–Lending Act] [12], state law disclosure requirements are preempted to the extent they are inconsistent with TILA [Truth–in–Lending Act] disclosure requirements....

....

38. Even if the AG had asserted potentially actionable misrepresentations under the UTPCPL, he would still need to allege that these misrepresentations actually made a difference in the decision of Pennsylvania consumers to obtain a loan from NCAS. He has not done so.

....

43. The Commonwealth has not pled and cannot show the facts necessary to permit this Court to exercise personal jurisdiction over AA, Inc. and, as a result, AA, Inc. should be dismissed from this case.

....

47. Neither general nor specific jurisdiction over AA, Inc. exists. AA, Inc.'s contacts with Pennsylvania are far from "continuous and systematic" or even "minimum": **They are completely nonexistent** .... (emphasis in original).

48. Given the absence of a single fact in the Amended Complaint that would show some minimal contact between AA, Inc. and Pennsylvania, the Commonwealth must necessarily argue that *in personam jurisdiction* over AA, Inc. can be premised on the alleged actions of its subsidiary, NCAS. However, the Commonwealth has failed to plead and will be unable to demonstrate the requisite facts showing the improper relationship between the two separate entities necessary to justify imputed jurisdiction.

49. The Pennsylvania Supreme Court has instructed that "there is a *strong*

12. Section 1610(a)(1) of TILA, 15 U.S.C. § 1610(a)(1).

*presumption* in Pennsylvania *against piercing the corporate veil"* .... (citations omitted and emphasis added).

. . . .

52. The Commonwealth has failed to allege (and will not be able to show) that the relationship between AA, Inc. and NCAS [Advance America] justifies intrusion into the "sanctity of the corporate structure".... There are no allegations in the Amended Complaint that NCAS and AA, Inc. failed to follow corporate formalities, operated without proper levels of capital, intermingled their affairs or used the corporate form to perpetrate fraud. Nor does the Commonwealth [Department] allege AA, Inc. completely dominated and controlled NCAS such that the latter was merely a sham corporation.

Preliminary Objections of Defendants, February 13, 2009, Paragraphs 3–5, 10–13, 15, 18, 20–21, 24, 26, 30, 34, 38, 43, 47–49, and 52 at 2–6, 8–9, 12, 14–15, 17–19, and 21.

Plaintiffs filed a brief in opposition to Defendants' preliminary objections to the amended complaint.

## IV. Whether The Department Can Recover Damages From Advance America For Violation Of The CDCA And The LIPL As Alleged In Count 1 And Count 2?

■■■ Initially, Advance America asserts that any violation of either the CDCA or the LIPL as alleged in Count 1 and Count 2 of the Amended Complaint fails to afford the Department monetary relief and the recovery of damages.[13]

### A. Did Advance America's Alleged Violation Of The CDCA Afford The Department The Requested Monetary Relief?

The Department alleges in Count 1 of the Amended Complaint that Advance America violated Section 3.A of the CDCA, 7 P.S. § 6203.A, when it offered "loans or advances of money on credit" without "obtaining a license from the Secretary of Banking." The Department seeks, in addition to the injunctive relief granted in *NCAS I,* that "Advanced America is barred from collecting any principal, interest, or other charges in connection with the line of credit product ... [and] [d]isgorgement of all revenues Advanced America and AA earned by Advance America's illegal operations...." Count 1 of the Amended Complaint, Wherefore Clauses A. and C. at 10.

■■■ Defendants preliminarily object and assert that there is no provision in the CDCA that provides for the monetary relief requested by the Department for Advance America's violation of the CDCA. This Court agrees.

Section 18 (**Penalties**) of the CDCA, 7 P.S. § 6218, provides:

*Any person who has not obtained a license from the Secretary of Banking*

---

13. This Court's review of preliminary objections in the nature of a demurrer is limited to a determination of whether on the facts alleged the law states with certainty that no recovery is necessary. *Hawks by Hawks v. Livermore,* 157 Pa.Cmwlth. 243, 629 A.2d 270, 271 n. 3 (1993). Further, this Court must accept as "true all well-pled facts, which are material and relevant, as well as all inferences reasonably deducible therefrom." *Cohen v. City of Philadelphia,* 806 A.2d 905, 912 (Pa.Cmwlth.2002). "And, in deciding whether to sustain a demurrer, this Court is not required to accept as true legal conclusions, unwarranted factual inferences, allegations that constitute argument, or mere opinion." *Id* at 912. "Moreover, a demurrer will not be sustained unless the Court finds that on the face of the complaint the law will not allow recovery; furthermore, any doubts are to be resolved against sustaining the demurrer." *Id* at 912.

... in accordance with the provisions of this act, and who shall engage in the business of negotiating or making loans or advances of money or credit, in the amount or value of fifteen thousand dollars ($15,000) or less, and charge, collect, contract for or receive interest, discount, bonus, fees, fines, commissions, charges or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced, or on the unpaid principal balances when the contract is payable by stated installments, *shall be guilty of a misdemeanor, upon conviction thereof shall be sentenced to pay a fine of not less than five hundred dollars ($500) or more than five thousand dollars ($5,000), and/or suffer imprisonment not less than six (6) months nor more than three (3) years, in the discretion of the court.* (emphasis added).

Clearly, Section 18 of the CDCA, 7 P.S. § 6218, only provides for criminal sanctions for a violation of the CDCA and not a monetary remedy in the nature of damages as requested by the Department. Therefore, this Court sustains Defendants' preliminary objections to Count 1 of the Amended Complaint.

B. *Would Advance America's Alleged Violation Of The LIPL, If Established, Authorize The Requested Monetary Relief?*

The Department alleges in Count 2 of the Amended Complaint that Advance America violated Section 201 of the LIPL, 41 P.S. § 201, when it charged interest on loans in excess of "six per cent per annum." The Department seeks, among other things, "damages in an amount three times the damages sustained by Advance America's customers in connection with Advance America's violation" of the LIPL

and "[d]isgorgement of all revenues Advance America and AA earned ..." Count 2 of the Amended Complaint, Wherefore Clauses C. and D. at 12.

Defendants preliminarily object and assert that only individual borrowers can institute an action against Advance America for interest on the loan in excess of the six percent maximum mandated under Section 201 of LIPL, 41 P.S. § 201.

Initially, Section 504 (**Individual actions permitted**) of the LIPL, 41 P.S. § 504, provides:

"*Any person affected by a violation of the act shall have the substantive right to bring an action on behalf of himself individually for damages* by reason of such conduct or violation, together with costs including reasonable attorney fees and such other relief to which such person may be entitled under law." (emphasis added).

Further, Section 502 (**Usury and excess charges recoverable**) of the LIPL, 41 P.S. § 502, provides:

A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law *may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges ....* Recovery of triple the amount of such excess interest or charges, but not the actual amount of such excess interest or charges, shall be limited to a four-year period of the contract. (emphasis added).

Finally, Section 505 (**Penalties**) of the LIPL, 41 P.S. § 505, provides that "*[a]ny person who knowingly and intentionally violates the provisions of this act shall be*

*guilty of a misdemeanor of the third degree.*" (emphasis added).

Defendants again preliminarily object to Count 2 of the Amended Complaint and assert that there is also no promulgated authority under the LIPL that authorizes the Department to seek declaratory relief and recovery of the principal and interest earned from loans to Pennsylvania borrowers from Advance America.

In opposition to Defendants' preliminary objection to Count 2 of the Amended Complaint, the Department presents a four-prong argument in support of its position that the Department is entitled to monetary relief under the LIPL.

*First,* the Department cites to Section 506(c)(3) of the LIPL, 41 P.S. § 506(c)(3), for the statutory authority to seek monetary relief in the nature of damages against Advance America. *Second,* the Department alleges that it possesses an inherent "sovereign interest" to protect the Pennsylvania borrower and recover damages from Advance America. *Third,* the Department cites to *parens patriae* standing as authority to seek monetary relief in order to protect the economic well-being of the citizens of the Commonwealth. *Fourth,* the Department claims that it is entitled to a declaratory judgment against Advance America. This Court shall seriately address the Department's arguments.

1. *Whether Section 506(c)(3) Of The LIPL, 41 P.S. § 506(c)(3), Provides The Statutory Authority For The Department To Obtain Monetary Relief?*

█ Section 506(c)(3) of the LIPL provides that "[i]f the department determines that a person has violated the provisions of this act, the department may ... [o]rder the person to cease and desist any violation of this act and *to make restitution for actual damages to any aggrieved person.*" (emphasis added). Here, the Department contends that the General Assembly statutorily authorized the Department "to order restitution itself and therefore the Department may seek restitution as a judicial remedy in an enforcement action." *See* Plaintiffs' Brief in Opposition to Defendants' Preliminary Objections to Amended Complaint at 11. This Court disagrees.

**First,** Section 506(c)(3) of the LIPL, 41 P.S. § 506(c)(3), *was added by the Act of July 8, 2008,* P.L. 824, No. 57, *effective in sixty days or September 8, 2008,* more than one year after Advance America ceased operation in Pennsylvania. *See* Plaintiffs' Amended Complaint, Paragraph 38 at 10 (Advanced America ceased doing business in Pennsylvania pursuant to this Court's order of July 31, 2007).

**Second,** the retroactive application of Section 506(c)(3) of the LIPL, 41 P.S. § 506(c)(3) to the present controversy would increase Advance America's exposure to civil penalties. Section 1926 of the Statutory Construction Act of 1972(Act), 1 Pa.C.S. § 1926, provides that "*[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly.*"[14] (emphasis added).

In *Morabito's Auto Sales v. Department of Transportation,* 552 Pa. 291, 715 A.2d 384 (1998), our Pennsylvania Supreme Court reviewed Section 1926 of the Act, 1 Pa.C.S. § 1926, and noted:

*It is well settled, however, that legislation concerning purely procedural matters will be applied not only to litigation commenced after its passage, but also to*

---

**14.** Also, Article I, Section 17 of the Pennsylvania Constitution provides that "*[n]o ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed.*" (emphasis added).

*litigation existing at the time of passage* . . . .

As stated in *Galant* [*v. Department of Environmental Resources*, 534 Pa. 17, 21–22, 626 A.2d 496, 498–99 (1993) ], The general rule in determining whether a statute will be applied retroactively is as follows: *"Legislation which affects rights will not be construed to be retroactive unless it is declared so in the act. But, where it concerns merely the mode of procedure, it is applied, as of course, to litigation existing at the time of its passage . . . ." . . . .*

534 Pa. at 21, 626 A.2d at 498.

*. . . In general terms, substantive laws are those which affect rights, while procedural laws are those which address methods by which rights are enforced* . . . .

*Morabito's Auto Sales,* 552 Pa. at 295, 715 A.2d at 386. (citations omitted and emphasis added).

Obviously, the Department's attempt to apply Section 506(c)(3) of the LIPL affects Advance America's substantive rights because it would increase its potential liability.[15] Presently, each individual borrower may institute an action against Advance America for monetary damages, costs, and attorney fees pursuant to Section 504 of the LIPL, 41 P.S. § 504. Additionally, individual borrowers may recover triple the amount of the excessive interest or charges paid to Advance America pursuant to Section 502 of the LIPL, 41 P.S. § 502. This Court will not conclude, without an express legislative intent by the General Assembly, that the Department possesses the same legal rights as an individual borrower. The retroactive application of Section 506(c)(3) of the LIPL would be unfair and highly prejudicial to Advance America's rights. Therefore, this Court must reject this argument.

### 2. Whether The Department Has An Inherent Sovereign Interest To Seek Monetary Relief Under The LIPL?

The Department alleges that its ability to seek monetary relief is derived from its sovereign interest in enforcing Pennsylvania law. Specifically, the Department cites to Section 503.C of the Banking Code, 71 P.S. § 733–503.C for the proposition that the General Assembly granted it broad discretion to determine what judicial remedies to pursue to protect the citizens of Pennsylvania.[16]

---

**15.** The General Assembly's intent with the enactment of Section 506(c)(3) of the LIPL, 41 P.S. § 506(c)(3), was to provide the Department with the authority to issue an enforcement action. In essence, a borrower may now proceed before the Department and seek restitution for his or her actual damages. The Department would then investigate the alleged illegal activity of the lender and pursuant to Section 506(b) of the LIPL, 41 P.S. § 506(b), issue subpoenas and require the production of documents. If the Department concludes that that the lender violated the LIPL, it may order restitution of the borrower's actual damages under Section 506(c)(3) of the LIPL. The lender then may request a hearing before the hearing officer who "may review or revise determinations made by the department." *See* Section 502 E(8) of the

Department of Banking Code, 71 P.S. § 733–503 E(8). Last, the lender and/or the Department, as an aggrieved party, may appeal to this Court. *See* 2 Pa.C.S. § 702. Obviously, this procedure was not followed in the present matter. Section 1953 of the Act, 1 Pa. C.S. § 1953, provides that "the portions of statute which were not altered by the amendment shall be construed as effective from the time of their original enactment, and the new provisions shall be construed as effective only from the date when the amendment became effective."

**16.** The Department contends that it may not ignore the fact that the Defendants have kept millions of dollars that were illegal obtained in violation of the CDCA and the LIPL which were promulgated to protect "weak and

■ Contrary to the Department's position, it may not claim an "inherent sovereign interest" as a basis to seek monetary relief against Advance America under the provisions of the LIPL. Such an interpretation runs afoul of the separation of powers under the Pennsylvania Constitution and would vest the Department and the Attorney General with unconstrained authority.

In *Sweeney v. Tucker*, 473 Pa. 493, 507, 375 A.2d 698, 705 (1977) our Pennsylvania Supreme Court cogently defined the separation of powers [17]:

> A basic precept of our form of government is that the executive, the legislative, and the judiciary are independent, co-equal branches of government. *Carroll v. Tate*, 442 Pa. 45, 274 A.2d 193 (1971) (plurality opinion). The dividing lines among the three branches 'are sometimes indistinct and are probably incapable of any precise definition.' . . . *Under the principle of separation of powers of government, however, no branch should exercise the functions exclusively committed to another branch.* (citations and footnote omitted and emphasis added).

Here, the General Assembly expressly granted the Department under the LIPL,

and for that matter the CDCA, the authority to seek an injunction and to pursue criminal sanctions against a lender who violates these statutes. There is no express authority granted to the Department to seek monetary relief against a lender to recover alleged unlawful and ill gotten gains. The only inherent authority the Department retains is that *"power which is inherent in the sense of being necessarily implied in an express grant of power."* (emphasis added). *Penn Anthracite Mining Co. v. Anthracite Miners of Pennsylvania*, 318 Pa. 401, 416–17, 178 A. 291, 297 (1935). This Court must reject the Department's argument.

### 3. Whether The Department Has Parens Patriae Standing To Seek Monetary Relief Under The LIPL?

■ The Department next claims that it has *parens patriae* standing to pursue an action for monetary relief and seek damages on behalf of individual borrowers in Pennsylvania. Advance America counters that there is no *parens patriae* standing on the behalf of individual borrowers.

In *Commonwealth v. TAP Pharmaceutical Products, Inc. (TAP II)*, 885 A.2d 1127 (Pa.Cmwlth.2005) [18], this Court enun-

needy borrowers from extortion and outrageous demands of unscrupulous lenders." *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379 (3d Cir.2000) (quoting 47 C.J.S. "Interest & Usury § 88 (1982))". *See* Plaintiffs' Brief In Opposition to Defendants' Preliminary Objections at 8.

17. Article II, Section 1 of the Pennsylvania Constitution provides that "[t]he legislative power of this Commonwealth shall be vested in General Assembly which shall consist of a Senate and House of Representatives." Article IV, Section 1 of the Pennsylvania Constitution provides that "[t]he Executive Department of this Commonwealth shall consist of a[n] ... Attorney General ... and such other officers as the General Assembly may from time to time prescribe." Article IV, Section

4.1 of the Pennsylvania Constitution provides that "[a]n Attorney General ... shall be the chief law officer of the Commonwealth and shall exercise such powers and perform such duties as imposed by law."

18. In *TAP II*, the factual situation was as follows:

> As noted in this Court's earlier decision in this matter, *TAP I* [*Commonwealth v. TAP Pharmaceutical Products, Inc.*, 868 A.2d 624 (Pa.Cmwlth.2005) (*TAP I*)], the present controversy arose around the use of a pricing standard know as the Average Wholesale Price (AWP). The Commonwealth's claims are based generally on its assertion that all the Defendants knowingly inflated this self-reported AWP for inclusion in a

ciated the necessary criteria in order for the Commonwealth to have *parens patriae* standing:

> The key to resolving this question is determining *whether the Commonwealth has pleaded a quasi-sovereign interest rather than simply representing the interests of individuals who could have pursued their own claims.* A "state must assert an injury to what has been characterized as a 'quasi-sovereign' interest, which is a judicial construct that does not lend itself to a simple or exact definition." *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982).[19] In *Alfred L. Snapp & Son, Inc.* the [United States] Supreme Court noted that states may have three types of interest: *those purely sovereign, those non-sovereign, and those that are quasi-sovereign.* The first type consists of the state's power to develop and enforce civil and criminal codes, and the right to demand recognition from other sovereigns, such as might occur in a border dispute. The second type encompasses a state's proprietary interests and its pursuit of the interest of private parties, in which case the state is only a nominal party. *The third category, quasi-sovereign interests, "consist of a set of interests that the State has in the well-being of its populace."* 458 U.S. at 601–602, 102 S.Ct. 3260. . . .
>
> As noted by the [United States Supreme] Court in that opinion, within the spectrum of interests that the Court has regarded as quasi-sovereign is included a *state's interest in the economic well-being of its people.* 458 U.S. at 606, 102 S.Ct. 3260 (quoting *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) (in which the state of Georgia had asserted that a large number of railroad companies had conspired to fix rates in a discriminatory way that violated antitrust laws)). The [United States Supreme] Court, *while pointing out that a state claiming such standing must allege more "than injury to an identifiable group of individuals residents* [,]" also stated that "*the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population.*" 458 U.S. at 607, 102 S.Ct. 3260.

*TAP II,* 885 A.2d at 1143.

In *TAP II,* this Court determined that the Commonwealth asserted its own quasi-sovereign interest because "[t]he Complaint contends that the use of AWPs has affected the economic health and well-being of its citizens by requiring those purchasers and reimbursers of the Defen-

---

pharmaceutical publication upon which the Commonwealth relied. The Commonwealth alleges that the reason the Defendants inflated the AWP, which in some cases reflected a price hundreds of times higher than what would constitute an actual average wholesale price, is that the Defendants would generate revenue by virtue of direct purchasers paying more for their products and such systematic inflation would also result increased market share. As stated above, AWPs are used by the Commonwealth to establish a basis for reimbursement to the middleman-such as physicians who administer drugs to patients directly (such as intravenous cancer drugs)

and pharmacy benefit managers who buy in quantity for resale to customers. . . .

. . . .

The Commonwealth further points out that the AWP plays a significant role in budgeting strategies, and that it affects administrative decisions, we presume such as eligibility standards based on income and the scope of coverage.

*Id.* at 1132–33.

19. The Department cites this case to support its argument that it has *parens patriae* standing.

dants' drugs to pay inflated amounts for the Defendants' drugs." *Id.* at 1144. Critical to this Court's determination that the Commonwealth had *parens patriae* standing was that had the drug companies not *"inflated the AWPs the Commonwealth may have been better able to provide needed medications to more citizens than it has"* and that the *"inflated AWPs affected the extent of benefits to which those covered under the Commonwealth's programs could claim entitlement." Id.* at 1144 n. 9.

Here, this Court must conclude that the Department lacks *parens patriae* standing. **First,** unlike *TAP II,* the Department fails to allege that the violations of the CDCA and the LIPL affected the efficacy or reach of a Commonwealth-sponsored benefits program or government entitlement. Also, the Department fails to allege any other legitimate quasi-sovereign governmental interest. Specifically, if the potential claims of Advance America's borrowers are set aside, as the *parens patriae* case law directs, the Department is left without a concrete, independent, and direct interest to protect.

**Second,** the damages sought by the Department do not represent a quasi-sovereign interest but that of the individual borrower. The monetary relief the Department seeks in Count 2 of the Amended Complaint is premised on the numerous remedies available to individual borrowers under the LIPL. Specifically, an action for unlawful interest under Section 501 of the LIPL, with the right to claim three times the amount of unlawful interest charged under Section 502 of the LIPL, and finally, attorney fees and costs under Section 503(a) of the LIPL.

**Last,** if this Court were to conclude that the Department has *parens patriae* standing, Advance America would be exposed to liability once from the Department, and second from individual borrowers that have either filed an action or plan to file an action.[20] Again, the LIPL mandates a particular remedy for the wronged party. "Where ... there is a clear statutory remedy, which is adequate, it is exclusive." (footnote omitted). *Department of Environmental Resources v. Williams,* 57 Pa. Cmwlth. 8, 425 A.2d 871, 872–73 (1981).

### *4. Whether The Department May Seek Declaratory Relief To Enforce The CDCA And The LIPL?*

The Department alleges in Count 2 of the Amended Complaint that it is entitled to the following relief:

A. declaratory judgment that (1) Advance America offered its line of credit product in violation of the Loan Interest and Protection Law; (2) the loan agreements that Advance America entered into with consumers [borrowers] in connection with its line of credit products were illegal, void, and unenforceable; and (3) Advance America is barred from collecting any principal, interest, or other charges in connection with the line of credit product.

**20.** Additionally, there are serious due process questions as to whether Advance America may face litigation a second time based upon the same transaction. In fact, Advance America directs this Court's attention to "[t]he Commonwealth's [Department's] concern about NCAS [Advance America] escaping with ill-gotten gains ignores pending class action lawsuits seeking to recover three times the alleged overcharges NCAS [Advance America] generated in its loan program." *Johnson v. Advance America, Cash Advance Centers, Inc.,* No. 07–3142, 2007 WL 2806525 (E.D. Pa. filed August 1, 2007); and *Clerk v. Cash America Net of Nevada, LLC,* No. 09–02245 (E.D. Pa. filed May 19, 2009). *See* Defendants' Reply Memorandum in Support of Preliminary Objections to Amended Complaint at 19 n. 10.

Amended Complaint, the Wherefore Clause A. at 12. Alternatively, the Department asserts that Advance America waived its argument that the Department lacked the statutory authority to request declaratory relief [21] once there was a failure to object to the Department's request for declaratory relief in the original complaint.

Section 506(a) of the LIPL, 41 P.S. § 506(a), provides that *"[w]hen the Attorney General has reason to believe that any person has violated the provisions of this act … he shall have standing to bring a civil action for injunctive relief and other such relief as may be appropriate to secure compliance with this act …."* (emphasis added).

Section 503 C f the Banking Code, 71 P.S. § 733–503 C, provides that "[t]he department may maintain an action in Commonwealth Court *or any other court of competent jurisdiction for an injunction or other process against any person to restrain and prevent the person from engaging in any activity violating this act or any other statute …."* (emphasis added).

■ Advance America responds that the above-stated statutes clearly provide only such necessary relief as to bring a lender into compliance with the law. The LIPL and the Banking Code do not authorize "the backward-looking relief the Department is seeking." Reply Memorandum Brief of Defendants' Preliminary Objections to Amended Complaint at 21. This Court agrees.

The Department, under the LIPL and the Banking Code, sought and was granted injunctive relief to enjoin Advance America from continuing to offer its credit line of products to Pennsylvania borrowers. Although, as referred to earlier, the LIPL does provide numerous remedies for the borrower, in addition to injunctive relief, the LIPL does not contain a provision that authorizes voiding the principal loan. As our Pennsylvania Supreme Court noted, "[t]here is no doubt that the note [loan] called for a usurious rate of interest … this defect, however, rendered the note [loan] not void, but *only voidable as to the interest specified beyond the lawful rate"* (citation omitted and emphasis added). *Mulcahy v. Loftus,* 439 Pa. 111, 112, 267 A.2d 872, 873 (1970).[22]

■ Alternatively, Advance America rebuts that its failure to object to the request for declaratory relief in the original complaint precludes Advance America from now objecting. Cogently, Advance America maintains that "[t]he original Complaint was amended to include, *inter alia,* a new defendant, a new plaintiff and a new and different declaratory judgment request [where] [t]he original complaint sought only a 'declaratory judgment that Advance America's Monthly Participation Fee is not authorized by Pennsylvania law….'" *See* Defendants' Reply Memorandum in Support of Preliminary Objections to the Amended Complaint at 20. Advance America properly concludes that "[given the radically different relief the Commonwealth [Department] now re-

---

21. 42 Pa.C.S. § 7532 provides:
 Courts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or degree is prayed for. The declaration may be either affirma-
 tive or negative in form and effect, and such declarations shall have the force and effect of a final judgment.

22. In *Mulcahy,* our Pennsylvania Supreme Court interpreted Section 1 of the Act of May 28, 1858, P.L. 622, 41 P.S. § 3 which was the predecessor to the LIPL.

quests against both defendants [Advance America and AA] in the Amended Complaint, defendants [Advance America and AA] clearly did not waive the right to assert their Objection.]" *See* Reply Memorandum at 20. This Court rejects the Department's final argument and sustains Defendants' preliminary objection to Count 2 of the Amended Complaint.

## V. Whether The Attorney General Has Adequately Pled A Per Se Violation Of The Unfair Trade Practices and Consumer Protection Law (UTPCPL) Under Count 3 Of the Amended Complaint?

The Attorney General[23] first alleges in Count 3 of the Amended Complaint that Advance America's violation of the CDCA, as found by this Court in *NCAS I*, and Advance America's alleged violation of the LIPL in the present matter constitutes a *per se* violation of the UTPCPL. *See* Defendants' Memorandum of Law in Support of Preliminary Objections at 17 and Amended Complaint, Paragraph 49 at 13. Specifically, the Attorney General alleges that Advance America engaged in providing loans to Pennsylvania consumers/borrowers without a license and charged an interest rate to Pennsylvania consumers/borrowers in excess of the maximum lawful rate of six percent in violation of Section 3 of the CDCA, 7 P.S. § 6203, and Section 201 of the LIPL, 41 P.S. § 201, respectively.

 A review of the provisions of the UTPCPL fail to establish that a violation of either the CDCA or the LIPL constitutes a *per se* violation of the UTPCPL. The Attorney General also fails to direct this Court to such a provision in the UTPCPL, or for that matter, any provision in the CDCA, the LIPL, or the Banking Code that expressly states a violation of these statutes automatically constitutes a *per se* violation of the UTPCPL.

To the contrary, Advance America directs this Court to numerous statutes[24] that specifically provide that a violation of a certain statute amounts to a violation of the UTPCPL. For example, 42 Pa.C.S. § 2524 (penalty for unauthorized practice of law) provides that (c) "[i]n addition to criminal prosecution, unauthorized practice of law may be enjoined in any county court of common pleas having personal jurisdiction over the defendant ... [a] *violation of subsection (a) is also a violation of the ... Unfair Trade Practices and Consumer Protection Law* " (emphasis added).

66 Pa.C.S. § 2905(g) (enforcement) provides that (3) "*[f]ailure of a telephone message service to comply with this section shall be a violation of the ... Unfair Trade Practices and Consumer Protection Law ...* and 18 Pa.C.S. Ch. 39" (relating to theft and related offenses). (emphasis added).

Also, 42 Pa.C.S. § 6906 (Lessor's liability for noncompliance) (a) (violation of the law) provides that "[a] *violation of this chapter shall constitute a violation of the ... Unfair Trade Practices and Consumer Protection Law,* and shall be subject to

---

**23.** Section 4 of the UTPCPL, 73 P.S. § 201–4, provides that "[w]henever the Attorney General ... has reason to believe that any person is using or about to use any method, act or practice declared by section 3 of this act to be unlawful, and that proceeding would be in the public interest, he may bring an action in the name of the Commonwealth against such person ..."

**24.** Defendants cite to nineteen other statutes that explicitly state a violation of that particular statute is a violation of UTPCPL. *See* Defendants' Memorandum of Law in Support of Preliminary Objections at 21–22.

the enforcement provisions and private rights of action contained in that act as limited in this section" and (e) (counterclaim or defense) "[a] lessee may not take any action to offset any amount for which a lessor is potentially liable under *the Unfair Trade Practices and Consumer Protection Law* . . . ." (emphasis added).

 "It is a principle of statutory construction that when a legislature adopts a statute it must be presumed that it does so with full knowledge of existing statutes relating to the same subject." (citations omitted). *Seliga v. State Employes' Retirement System,* 682 A.2d 77, 79 (Pa. Cmwlth.1996). "Thus, where a section of a statute contains a given provision, the omission of that provision from a similar section is significant to show a different intention existed." (citation omitted). *Id.* at 79. This Court concludes the General Assembly did not intend for a violation of either the CDCA or the LIPL to consti-

tute a *per se* violation of the UTPCPL.[25] Therefore, this Court must reject the Attorney General's position and sustain Defendants' preliminary objection to the *per se* violation allegations in Count 3 of the Amended Complaint.

## VI. Whether The Attorney General Adequately Pled A Violation Of The UTPCPL Under Count 3 And Count 4 Of The Amended Complaint?

Next, the Attorney General alleges in Count 3 of the Amended Complaint that Advance America "held itself out" as a lawful lender offering a lawful credit product and as a result Advance America employed an unfair or deceptive act or practice as defined in Section 2(4)(ii)-(iii), (v), and (xxi) of the UTPCPL, 73 P.S. § 201–2(4)(ii)–(iii), (v), and (xxi). *See* Amended Complaint, Count 3, Paragraphs 51 and 52 at 13–14.[26]

25. Defendants in the reply brief memorandum persuasively distinguish the four cases that the Attorney General cites in support of the *per se* violation argument:

> The AG [Attorney General] relies on four cases to support that 'violation of other consumer protection legislation are deemed a violation of the CPL.' (Pl. Br. 32.) None of those cases, however, stands for so broad a proposition. *Hammer v. Nikol,* 659 A.2d 617 (Pa.Commw.Ct.1995), merely held that *unlawful conduct that is also fraudulent* violates the UTPCPL. *Id.* at 620 (conduct that violated a city ordinance also violated the UTPCPL because the trial court record showed all the elements of common fraud). And the three remaining cases, *Commonwealth v. Peoples Benefit Services,* 923 A.2d 1230 (Pa.Commw.Ct.2007), *Commonwealth v. Tolleson,* 14 Pa.Cmwlth. 72, 321 A.2d 664 [ (1974) ], and *Commonwealth v. Armstrong,* 74 Pa. D. & C.2d 579, 583 (C.P.Phila.Co.1974), all involved violations of the Fictitious Names Act ("FNA") [the FNA is presently codified at 54 Pa.C.S. § [§ ]301 . . . [–]332] a law that is aimed at preventing one of the chief wrongdoings identified in the UTPCPL-confusing consumers about

the 'source' of a good or service. 73 P.S. § 201–2(4)(ii) ].

> Unlike the FNA, neither the CDCA nor the LIPL has as its primary aim the prevention of fraud or deceit. The AG [Attorney General] concedes this, acknowledging that these laws protect consumers from paying too much interest, (footnotes and citations omitted and emphasis in original).

*See* Defendants' Reply Memorandum in Support of Preliminary Objections to the Amended Complaint at 29.

Defendants also distinguish the other cases cited by the Attorney General in support of *per se* liability. *See* Defendants' Reply Memorandum in Support of Preliminary Objections to the Amended Complaint at 30–32.

26. The Attorney General also alleges in Count 3 of the Amended Complaint:

> . . . .

> 54. In furtherance of their common interests and pursuant to a common design, AA created Advance America and established its loan centers to offer the line of credit product in the Commonwealth, when it knew or should have known that Advance America was thereby violating the Consumer Protection Law [UTPCPL].

Additionally, in Count 4 of the Amended Complaint, the Attorney General alleges that Advance America represented to Pennsylvania consumers/borrowers that the finance charge on the loan was at a 5.98% interest when in fact it was at a much higher interest rate after the $149.95 monthly participation fee was added. *See* Amended Complaint, Count 4, Paragraphs 58–61 at 16. Again, the Attorney General alleges that Advance America's conduct was unfair and deceptive as defined in Section 2(4)(ii)-(iii), (v), and (xxi) of the UTPCPL, 73 P.S. § 201–2(4)(ii)-(iii), (v), and (xxi).[27]

 Defendants preliminarily object and assert that the Attorney General has not identified any representation that Advance America made concerning the lawfulness of its operation or product and that such a representation may not be implied from Advance America's placement of its product on the market. This Court disagrees.

In *Feeney v. Disston Manor Personal Care Home,* 849 A.2d 590, 597 (Pa.Super.), *appeal denied,* 581 Pa. 691, 864 A.2d 529 (2004), our Pennsylvania Superior Court noted:

> *In order to state a claim under UTPCPL, a plaintiff must allege one of the 'unfair or deceptive practices' set forth in 73 P.S. § 201–2(4)(i)–(xxi) .... The general purpose of the UTPCPL is to protect the public from fraud and unfair or deceptive business practices, and the statute is the principal means for doing so in the Commonwealth ....*[28] (citations omitted and emphasis added).

---

55. AA rendered substantial assistance to Advance America to establish and operate loan centers and offer the line of credit product in the Commonwealth .... Amended Complaint, Paragraphs 54 and 55 at 14.

27. The Attorney General again alleges that AA rendered substantial assistance to Advance America with knowledge that Advance America was violating the UTPCPL. Amended Complaint, Paragraphs 63 and 64 at 16–17.

28. In *Feeney,* our Superior Court stated the elements of common law fraud that must be proven in order to recover under the catchall provisions of Section 2(4)(xxi) of the UTPCPL:

> [A] plaintiff must demonstrate by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance ....

*Id.* at 597.

However, this Court has adopted a less restrictive interpretation for pleading fraud after the 1996 amendments to the UTPCPL than pleading common law fraud. In *Commonwealth v. Percudani,* 825 A.2d 743 (Pa. Cmwlth.2003), this Court stated:

> This Court has not addressed the 1996 amendments to the Law [UTPCPL] and their effect on pleading fraud under Section 2(4)(xxi). In our research, we have uncovered two divergent views. *The Superior Court of Pennsylvania has issued several opinions after the 1996 amendments in which it continues to state that a plaintiff must allege the elements of common law fraud in order to recover under the catchall provisions of Section 2(4)(xxi) ....* Conversely, several decisions of the Bankruptcy Court for the Eastern District of Pennsylvania have rejected the Superior Court's adherence to the pre–1996 pleadings requirement.... In *Rodriguez v. Mellon Bank, N.A.,* 218 B.R. 764 (Bankr. E.D.Pa.1998) ... the Bankruptcy Court rejected the pre–1996 pleadings requirements noting *that the Legislature's addition of the words 'or deceptive conduct' signals an approval of a less restrictive interpretation of the law and affirms the Supreme Court's position that the Law [UTPCPL] should be liberally construed.* In *Flores [v. Shapiro & Kreisman,* 246 F.Supp.2d 427 (E.D.Pa.2002) ] the Bankruptcy Court ... noted that maintaining the

Further, in *Commonwealth v. Peoples Benefit Services, Inc.,* 923 A.2d 1230, 1236–37 (Pa.Cmwlth.2007), this Court also noted:

An act or a practice is deceptive or unfair if it has the 'capacity or tendency to deceive'.... *Neither the intention to deceive nor actual deception must be proved; rather, it need only be shown that the acts and practices are capable of being interpreted in a misleading way* .... The test for the court is to determine the overall impression arising from the totality of what is said, as well as what is reasonably implied, in the advertisement or solicitation.... Moreover, we are cognizant of our [S]upreme [C]ourt's directive that the UTPCPL is to be construed liberally to effectuate its objective of protecting consumers of this Commonwealth from fraud and unfair or deceptive business practices. (citations omitted and emphasis added).

Here, the Attorney General specifically alleges that Advance America's offering a line of credit product to the Pennsylvania consumer/borrower at an excessive rate of interest was unfair and deceptive conduct in violation of Section 2(4)(ii)-(iii), (v), and (xxi) of the UTPCPL, 73 P.S. § 201–2(4)(ii)–(iii), (v), and (xxi).

Section 2(4) of the UTPCPL, 73 P.S. § 201–2(4), provides:

(ii) *Causing likelihood of confusion or of misunderstanding as* to the source, sponsorship, approval or *certification of goods or services;* (emphasis added).

(iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

....

(v) *Representing that goods or services have* sponsorship, approval, characteristics, ingredients, uses, *benefits* or quantities *that they do not have or that a person has* a sponsorship, approval, status, *affiliation or connection that he does not have;* (emphasis added).

....

(xxi) *Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.* (emphasis added)

A fair reading of the Amended Complaint states that Advance America injured the economic health and well-being of the Pennsylvania consumer/borrower by illegally charging sham interest. The Attorney General's allegations strike at the core of Advance America's credit loan, i.e. that the monthly participation fee, as a matter of law, was tantamount to sham interest in excess of six percent.[29] Therefore, this Court must overrule Defendants' preliminary objections to Count 3 of the Amended Complaint. This Court concludes that the Attorney General adequately pled a violation of the UTPCPL. The same conclu-

---

pre–1996 *pleading requirements would render the words 'or deceptive conduct' redundant and superfluous, which is contrary to the rules of statutory construction* .... Prior to 1996, the Law [UTPCPL] merely prohibited 'other fraudulent conduct.' The Legislature's intervention in 1996 in conjunction with the Supreme Court's pronouncement that the Law [UTPCPL] is to be liberally construed and the Superior Court's continuing ... restrictive view of the Law [UTPCPL] *leads us to conclude that*

the position adopted by the Bankruptcy Court is that which would be espoused by the Supreme Court. (citations omitted and emphasis added)
*Id.* at 746–47.

**29.** The Attorney General illustrates to this Court that Defendants conduct was deceptive in that the use of the phony monthly participation fee resulted "in a real interest rate of 368%" which is plainly "unfair." *See* Plaintiffs' Brief in Opposition to Defendants' Preliminary Objections at 43.

sion is reached regarding Count 4 of the Amended Complaint.[30]

## VII. Conclusion.

Accordingly, this Court sustains Defendants' preliminary objections to Count 1 and Count 2 of the Amended Complaint. Additionally, this Court sustains Defendants' preliminary objections to Count 3 of the Amended Complaint that Advance America's violation of the UTPCPL constituted a *per se* violation of the CDCA and the LIPL. Last, this Court overrules Defendants' preliminary objections to Count 3 and Count 4 of the Amended Complaint that the Attorney General failed to adequately plead a violation of the UTPCPL.

Judge BUTLER dissents.

## *ORDER*

AND NOW, this 28th day of April, 2010, upon consideration of NCAS of Delaware, LLC, d/b/a Advance America Cash Advance Centers, and Advance America Cash Advance Centers, Inc.'s (Defendants') preliminary objections, this Court enters the following order: (1) Defendants' preliminary objections to Count 1 and Count 2 of the Pennsylvania Department of Banking and Commonwealth of Pennsylvania, Acting by Attorney General Thomas W. Corbett, Jr.'s (Plaintiffs') Amended Complaint are sustained; (2) Defendants' preliminary objection to Count 3 of Plaintiffs' Amended Complaint is sustained as to the Attorney General's allegations that Advance America's violation of the Unfair Trade Practices and Consumer Protection Law (UTPCPL) was a *per se* violation of the Consumer Discount Company Act and the Loan Interest Protection Law; (3) Defendants' preliminary objection to Count 3 and Count 4 of the Amended Complaint that the Attorney General failed to adequately plead a violation of the UTPCPL are overruled; and (4) Defendants are directed to file a responsive pleading within twenty (20) days of this order concerning the violation of the UTPCPL.

---

**30.** Defendants contend that "any disclosure of the Monthly Participation Fee by Advance America as part of the finance charge would violate the disclosure requirements of TILA and Reg Z [12 C.F.R. § 226.5(b)]. The AG's [Attorney General's] claim is therefore, preempted by federal law." *See* Defendants' Preliminary Objections to Plaintiffs' Amended Complaint at 28.

Section 1610(b) of the TILA, 15 U.S.C. § 1610(b) provides:

> State credit charge statutes. Except as provided in section 129 [15 USCS § 1639], *this title ... does not otherwise annul, alter or affect in any manner, scope or applicability of the laws of any State, including, but not limited to, laws relating to the types, amounts or rates of charges, or any element or charges, permissible under such laws in connection with the extension or use of credit,* nor does this title ... extend the applicability of those laws to any class of persons or transactions to which they would otherwise apply .... (emphasis added).

Regulation Z, 12 C.F.R. § 226.1 provides that *"[t]he regulation does not govern charges for consumer credit."* (emphasis added).

The Attorney General cogently responds that there is "no claim that the Defendants [Advance America] failed to comply with TILA or the accompanying Reg Z with respect to its disclosure ... Defendants' [Advance America's] argument assumes that the so-called 'Monthly Participation Fee' was in fact 'charged for participation in a credit plan on a monthly basis.' " *See* Plaintiffs' Brief in Opposition to Defendants' Preliminary Objections at 43. "The Commonwealth, on the other hand, contends that this 'fee' was nothing more than a ruse, artifice, and a subterfuge that was actually 'interest' as defined by Pennsylvania law." *See* Plaintiffs' Brief in Opposition to Defendants' Preliminary Objections at 43. This Court agrees with the Attorney General that Advance America may not raise the provisions of the TILA as a defense to avoid liability under the UTPCPL.

CONCURRING and DISSENTING OPINION BY Judge SIMPSON.

I concur in the thoughtful majority opinion regarding Counts III and IV of the Amended Complaint. I respectfully dissent, however, as to Counts I (violation of the Consumer Discount Company Act (CDCA)[1]) and II (violation of the act commonly known as Loan Interest and Protection Law (LIPL)[2]). For the following reasons, I would overrule objections to those Counts, thereby allowing all the Counts to proceed through the pleadings.

I part company with the majority over whether the Plaintiffs, both of which are Commonwealth parties, may assert claims for declaratory relief and recovery of excessive interest from loans to Pennsylvania borrowers from Advance America. I believe claims for these types of relief are sufficiently stated.

## I.

### a.

Among other arguments, the Plaintiff Commonwealth parties assert statutory authority for their claims under Section 503(C) of the Department of Banking Code (**Quo warranto or injunction proceedings; conduct of administrative proceedings relating to institutions and credit unions**).[3] That Section provides:

> The [D]epartment may maintain an action in Commonwealth Court or any other court of competent jurisdiction for *an injunction or other process* against any person to restrain and prevent the person from engaging in any activity violating this act or any other statute or

regulation within the [D]epartment's jurisdiction to administer or enforce.

71 P.S. § 733–503(C) (emphasis added). This provision expressly grants the Department of Banking authority to seek remedies beyond injunctions for statutes it is required to administer. The CDCA is such a statute.

### b.

Further, the Plaintiff Commonwealth parties assert statutory authority for their claims under Section 506(a) of the LIPL (**Enforcement**), which provides:

> (a) When the Attorney General has reason to believe that any person has violated the provisions of this act, or the regulations promulgated hereunder, he shall have standing to bring a civil action for *injunctive relief and such other relief as may be appropriate to secure compliance with this act or the regulations promulgated hereunder.*

41 P.S. § 506(a) (emphasis added). This provision expressly gives the Attorney General authority to seek remedies beyond injunctions.

### c.

The majority concludes that remedies beyond those seeking compliance are not authorized. Because prospective compliance has been secured by a previously entered injunction, no further remedies are available. Respectfully, I disagree.

The Plaintiff Commonwealth parties aver that Advance America collected tens of millions of dollars of illegal revenue from thousands of Pennsylvania residents. Am. Compl. at ¶¶ 21, 25. At this early stage of the litigation, we must accept

---

1. Act of April 8, 1973, P.L. 262, *as amended,* 7 P.S. §§ 6201–6219.

2. Act of January 30, 1974, P.L. 13, *as amended,* 41 P.S. §§ 101–605.

3. Act of May 15, 1933, P.L. 565, *as amended,* 71 P.S. § 733–503(C).

these averments as true. I believe the ongoing retention by Advance America of tens of millions of dollars of revenue collected in violation of the CDCA and the LIPL is not in compliance with the statutes. Therefore, I would overrule the preliminary objections to Counts I and II.

## II.

Furthermore, I believe the Plaintiff Commonwealth parties enjoy *parens patriae* standing to recover monetary damages in Counts I and II on behalf of the citizens of the Commonwealth. Our Court recently discussed *parens patriae* standing in *Commonwealth ex rel. Pappert v. TAP Pharmaceutical Products, Inc.* 885 A.2d 1127, 1143–44 (Pa.Cmwlth.2005) (suit by Attorney General in *parens patriae* on behalf of Pennsylvania citizens injured by pharmaceutical companies through allegedly improper conduct that caused Commonwealth entities and citizens to pay inflated prices for pharmaceuticals).

Here, as in *TAP Pharmaceutical Products,* the Commonwealth's Amended Complaint alleges sufficient facts supporting the Commonwealth's position. Specifically, the Amended Complaint contains averments that the Commonwealth brought suit to protect its sovereign interest in enforcing the statutory scheme enacted by the General Assembly for the regulation of lenders and the Commonwealth's quasi-sovereign interest in the economic well-being of its citizens. Am. Compl. at ¶ 4. The Commonwealth further avers its belief that Advance America offered its line of credit product to thousands of customers in Pennsylvania, and that by illegally charging consumers the Monthly Participation Fee on its line of credit product, together with an interest rate of 5.98%, Advance America injured the economic health and well-being of the Commonwealth's citizens. Am. Compl. at ¶¶ 21, 39.

Also, in *TAP Pharmaceutical Products* this Court relied heavily on a United States Supreme Court decision in *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). In that case, the United States Supreme Court offered an indication helpful in determining whether an alleged injury to the welfare of its citizens suffices to give a State standing to sue as *parens patriae:* whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers. *Id.* at 607, 102 S.Ct. 3260. Here, the injury alleged, excessive interest and related charges, is one which the Commonwealth attempted to address through its sovereign lawmaking powers. Applying the indication suggested by the United States Supreme Court, standing to sue as *parens patriae* is sufficiently stated.

For all these reasons, I would overrule preliminary objections to Counts I and II of the Amended Complaint, thus allowing all the Counts to proceed through pleadings.

President Judge LEADBETTER joins in this dissent.

CONCURRING OPINION BY Judge LEAVITT.

I join the majority's opinion, which I admire for its thorough and well reasoned analysis. I write separately to explain further why the Attorney General does not enjoy *parens patriae* authority in a usury case to seek damages on behalf of individual citizens, who may wish to pursue such actions on their own behalf.

The powers of the Attorney General begin with the Pennsylvania Constitution, and it states, in relevant part, as follows:

An Attorney General shall be chosen by the qualified electors of the Commonwealth ... [.] [H]e shall be the chief law

officer of the Commonwealth and shall exercise such powers and perform such duties *as may be imposed by law.*

PA. CONST. art. IV, § 4.1 (emphasis added). The law that imposes those powers and duties is the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, *as amended,* 71 P.S. §§ 732–101—732–506. Further, that act is the exclusive source of the Attorney General's powers; stated otherwise, the Attorney General's powers and duties have no basis in the common law, which is the source of the *parens patriae* doctrine.[1]

This was not always the case. Article IV, section 4.1 was added to the Pennsylvania Constitution by amendment in 1978. Prior to that amendment, the Attorney General was appointed by the governor; he, or she, served as a member of the governor's cabinet as head of the Department of Justice. Then, the Attorney General's powers and duties were set forth in the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §§ 51–732, and they were augmented by common law powers. In a landmark case, *Minerd v. Margiotti,* 325 Pa. 17, 188 A. 524 (1936), our Supreme Court expounded at some length on the historic antecedents of the Attorney General's common law power. It concluded that Pennsylvania's Attorney General

> is clothed with the powers and attributes which enveloped Attorneys General at common law, including the right ... to supersede and set aside the district at-

torney when in the Attorney General's judgment such action may be necessary.

*Id.* at 30–31, 188 A. at 530 (emphasis added).

The Attorney General's common law powers were not limited to the power to supersede a district attorney. The Attorney General also enjoyed the common law power to intervene in charitable trust cases on behalf of the citizens of Pennsylvania. *See, e.g., Commonwealth v. Barnes Foundation,* 398 Pa. 458, 467, 159 A.2d 500, 505 (1960) (holding that the Attorney General enjoys the common law power to participate in litigation involving charitable trusts).

In 1978, our Supreme Court overruled *Minerd,* finding "the reasoning in this line of decisions to be erroneous...." *Commonwealth v. Schab,* 477 Pa. 55, 60, 383 A.2d 819, 821 (1978). Accordingly, the Supreme Court held that the Attorney General lacked the power to supersede a district attorney in a criminal law enforcement matter. That same year the voters adopted Article IV, section 4.1 to institute the selection of our Attorney General by election, as opposed to gubernatorial appointment.

Thereafter, the newly elected Attorney General attempted to supersede a district attorney in a criminal case, arguing that the holding in *Schab* was no longer viable in light of the constitutional amendment. Specifically, in *Commonwealth v. Carsia,*

---

**1.** The origin of the *parens patriae* doctrine can be traced to medieval England. Conceptually, the doctrine is derived from the king's royal prerogative to act as the guardian of an individual unable to protect his own interests. The attorney general, at common law, was the chief legal representative of the sovereign in the courts and was the only officer who could prosecute on behalf of the people in order to protect the interests of the crown. As in England, a colonial attorney general, acting as the chief legal officer of a British colony, enjoyed broad common law power to bring suit in *parens patriae* on behalf of colonial citizens. Jay L. Himes, *State Parens Patriae Authority: The Evolution of the State Attorney General's Authority* 1–2, 18–19 (The Institute for Law and Economic Policy Symposium paper, Apr. 23, 2004), *available at* http://www.abanet.org/antitrust/at-committees/at-state/pdf/publications/other-pubs/parens.pdf.

512 Pa. 509, 517 A.2d 956 (1986), the Attorney General argued that the

> Commonwealth Attorneys Act is but one source of the Attorney General's powers, and that, moreover, the language of Article 4, section 4.1, of our state constitution and that of the Act evidence *an intent to retain the common law powers* of the Attorney General.

*Id.* at 512, 517 A.2d at 957–958 (emphasis added). The Supreme Court soundly rejected the claim that the Pennsylvania Constitution conferred any common law powers upon the elected Attorney General.

Our Supreme Court explained the meaning of Article IV, section 4.1 of the Pennsylvania Constitution as follows:

> In our view, the use of the language "as may be imposed" clearly shows an extension of power to the legislature to statutorily define and regulate the powers and duties of the Attorney General. The General Assembly utilized that grant of constitutional powers in 1980, and enacted the Commonwealth Attorneys Act. That Act made it clear that *the powers of the state Attorney General are* no longer an emanation from some bed of common law precepts, but are *now strictly a matter of legislative designation and enumeration.*

*Id.* at 513, 517 A.2d at 958 (emphasis added). In sum, under the Pennsylvania Constitution, the powers of the Attorney General are "strictly a matter of legislative designation and enumeration." *Id.*

**2.** It states, in relevant part:

> The Attorney General shall represent the Commonwealth and all Commonwealth agencies and upon request, the Departments of Auditor General and State Treasury and the Public Utility Commission in any action brought by or against the Commonwealth or its agencies, and *may intervene in any other action, including those*

In reaching this conclusion, the Supreme Court relied expressly upon a report of the Joint State Government Commission that had been prepared on the legislation needed to establish the scope and powers of the new Office of Attorney General. The Commission's final report explained that

> *[l]egislation* enacted by the General Assembly *is the exclusive source of the powers and duties of the elected Attorney General* pursuant to Article IV, Section 4.1. . . .

JOINT STATE GOV'T COMM'N, OFFICE OF ELECTED ATTORNEY GENERAL, FINAL REPORT 4 (1978). The legislation that was the subject of the Joint State Government Commission's report became the Commonwealth Attorneys Act.

The Commonwealth Attorneys Act does not invest the Attorney General with the *parens patriae* power that may have existed as a matter of common law prior to the *Schab* decision. However, the Act has invested the Attorney General with this type of power, *i.e.,* the power to initiate actions on behalf of citizens, in two circumstances. The Attorney General is invested with authority to intervene in charitable matters on behalf of citizens. 71 P.S. § 732–204(c).[2] Likewise, the Attorney General is authorized to represent the Commonwealth "*and its citizens* in any action brought for violation of the antitrust laws of the United States and the Commonwealth." *Id.* (emphasis added). The Commonwealth has not enacted a state antitrust statute, as expected.[3]

> *involving charitable bequests and trusts* or the constitutionality of any statute.
> 71 P.S. § 732–204(c) (emphasis added).

**3.** At the time the Joint State Government Commission filed its report, the General Assembly was considering 1977 House Bill 845, intended to create intrastate antitrust enforcement authority for the Attorney General. JOINT STATE GOV'T COMM'N, OFFICE OF ELECTED

In *Commonwealth v. TAP Pharmaceutical Products, Inc.*, 885 A.2d 1127 (Pa. Cmwlth.2005) *(TAP II)*, the Attorney General filed suit against pharmaceutical companies under the Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P.L. 1224, *as amended,* 73 P.S. §§ 201-1—201-9.3. The Attorney General asserted that he had *parens patriae* authority to pursue damages on behalf of Pennsylvania's citizens for "common law claims and claims under [the Unfair Trade Practices and Consumer Protection Law]." Attorney General Brief, *TAP II*, at 48. In preliminary objections, the respondents asserted that the Attorney General had improperly invoked *parens patriae* powers because he had not identified a sovereign interest in the challenged conduct, *i.e.,* overpricing. Finding that the Attorney General's complaint identified a quasi-sovereign interest in his claim for damages, we overruled the respondents' preliminary objections.

In considering the respondents' preliminary objections in *TAP II*, this Court relied upon the *parens patriae* analysis of *Snapp v. Puerto Rico,* 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982), the leading case on the scope of a state's *parens patriae* authority. Briefly, the United States Supreme Court held in *Snapp* that, generally, a state may not sue on behalf of its citizens without showing that a separate sovereign interest will also be served. *Id.* at 607, 102 S.Ct. 3260. In this case, the majority concludes, correctly, that the Attorney General's complaint exceeds the bounds of *parens patriae* as enunciated in *Snapp* because the sovereign interest is not implicated in the complaint.

*Snapp* explains the ambit of a state's *parens patriae* powers. However, it does not require a state to exercise *parens patriae* authority on behalf of its citizens, and it does not identify which state official will exercise those powers. These questions can only be determined by each state in accordance with its own constitution. In Pennsylvania, our Constitution has limited the Attorney General's powers to those established by "legislative designation and enumeration." *Carsia,* 512 Pa. at 513, 517 A.2d at 958.[4] The legislature has authorized the Attorney General to bring suit "on behalf of citizens," a *parens patriae* power, but only for violations of the Federal antitrust laws.[5] Neither the Commonwealth Attorneys Act nor any of Pennsylvania's usury laws authorize the Attorney General to seek damages "on behalf of citizens" for violations of our usury statutes.[6]

ATTORNEY GENERAL, FINAL REPORT 11 (1978). The bill died in committee and never passed the House. Pennsylvania General Assembly, Bill Information, Regular Session 1977–1978, House Bill 845, *available at* http://www.legis.state.pa.us/cfdocs/billinfo/billinfo.cfm?syear=1977&sind=0&body=H&type=B&BN=0845.

4. State agencies, which are creatures of statute, do not enjoy common law powers. *See Aetna Casualty and Surety Company v. Insurance Department,* 536 Pa. 105, 118, 638 A.2d 194, 200 (1994) (holding that an agency can "only exercise those powers which have been conferred upon it by the Legislature in clear and unmistakable language") (quotation omitted).

5. Should Pennsylvania ever enact a state antitrust law, the Attorney General's power to bring suit on behalf of citizens will extend to that law as well.

6. The usury statutes at issue in this appeal are: Consumer Discount Company Act, Act of April 8, 1937, P.L. 262, *as amended,* 7 P.S. §§ 6201–6219; Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P.L. 1224, *as amended,* 73 P.S. §§ 201-1—201-9.3; the act commonly known as the "Loan Interest and Protection Law," Act of January 30, 1974, P.L. 13, *as amended,* 41 P.S. §§ 101–605.

The General Assembly has charged the Attorney General with responsibility for enforcement of the Commonwealth's usury laws. Notably absent from that authority is the power to recover damages on behalf of individual borrowers. Absent this legislative "designation and enumeration," the conclusion that the Attorney General lacks *parens patriae* authority in this case could not be clearer given our Supreme Court's holding in *Carsia*, 512 Pa. 509, 517 A.2d 956.